In re CINAR CORPORATION
SECURITIES LITIGATION

Phillip G. Kelley, Kathy H. Kelley,
Michael G. Mayberry, and Sharon
H. Mayberry, Plaintiffs,

v.

Cinar Corporation, Micheline Charest,
and Ronald A. Weinberg,
Defendants.

Steven T. CARSON, Patricia L. Carson,
and Janet B. Dellosa, Plaintiffs,

v.

Cinar Corporation, Cinar Holdings, Inc.,
Micheline Charest, Ronald A. Wein-
berg, and Hasanain Panju, Defen-
dants.

Karen Hilderbrand, individually and on
behalf of a certain Electing Small
Business Trust and a certain Irrevoca-
ble Trust, and Kim Thompson, indi-
vidually and on behalf of certain
Electing Small Business Trusts and a
certain Irrevocable Trust, Plaintiffs,

v.

Cinar Corporation, Cinar Education
Inc., Micheline Charest, Ronald A.
Weinberg, and Hasanain Panju, De-
fendants.

No. MDL 00–1362(RJD).

United States District Court,
E.D. New York.

Feb. 25, 2002.

As Corrected March 5, 2002.

Neil L. Selinger, Esq., David Harrison, Esq., Jeanne F. D'Esposito, Esq., Lowey, Dannenberg, Bemporad & Selinger, P.C., White Plains, NY, for Class Action Plaintiffs.

Jeffrey J. Davis, Esq., M. James Grode, Esq., Moore & Van Allen, P.L.L.C., Charlotte, N.C., for Kelley Plaintiffs.

James T. Williams, Jr., Esq., Jennifer T. Harrod, Esq., Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., Greensboro, N.C., for Carson Plaintiffs.

Michael S. Elkin, Esq., Sharon P. Carlstedt, Esq., Veronica E. Rendon, Esq., Thelen, Reid & Priest, L.L.P., New York City, for Hilderbrand Plaintiffs.

Bruce H. Schneider, Esq., Claude V. Szyfer, Esq., Melissa B. Papke, Esq., Susannah Sweeney, Esq., Stroock & Stroock & Lavan, L.L.P., New York City, for Defendants Cinar Corp., Cinar Holdings, Inc. and Cinar Education, Inc.

Andrew J. Levander, Esq., Louis M. Solomon, Esq., Neil A. Steiner, Esq., Swidler, Berlin, Shereff, Friedman, L.L.P., New York City, for Defendants Ronald A. Weinberg and Micheline Charest.

Lance Croffoot–Suede, Esq., Sharon M. Sash, Esq., Squadron, Ellenoff, Plesent & Sheinfeld, L.L.P., New York City, for Defendant Marie–Josée Corbeil.

Paul J. Bschorr, Esq., Dewey Ballantine, L.L.P., New York City, for Defendant Hasanain Panju.

Jerome G. Snider, Esq., Matthew S. Stewart, Esq., Daniel F. Kolb, Esq., William C. Komaroff, Esq., Davis, Polk and Wardwell, New York City, for Defendant Ernst & Young, L.L.P.

### MEMORANDUM & ORDER

DEARIE, District Judge.

This case involves four separate actions arising out of allegedly fraudulent disclosures made by defendant CINAR Corporation ("CINAR" or "the Company") and its officers in various public financial statements issued during the period from April 8, 1998 through March 10, 2000. The first suit, *In re CINAR Corporation Securities Litigation*, No. 00–CV–1086 (E.D.N.Y. 2000), is a class action brought by plaintiffs who purchased shares of CINAR on the NASDAQ, the price of which they claim was artificially inflated by the allegedly fraudulent filings. The remaining three suits, *Kelley v. CINAR Corporation*, No. 1:00–CV–91–T (W.D.N.C.2000), *Carson v. CINAR Corporation*, No. 1:00–CV–626 (M.D.N.C.2000) and *Hilderbrand v. CINAR Corporation*, No. 01–CV–1985 (E.D.N.Y.2001) involve business owners in North Carolina and Ohio who sold their companies to CINAR in exchange for CINAR stock relying on the Company's financial statements as an accurate indicator of its fiscal health. Plaintiffs in these four actions assert claims arising under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") and Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b–5 promulgated thereunder, as well as various state law causes of action. In addition to these suits, a group of Canadian plaintiffs who bought CINAR stock on Canadian exchanges have brought suit in Canada, alleging similar causes of action. The Judicial Panel on Multidistrict Litigation consolidated the four actions brought by American plaintiffs and transferred them to this Court for pre-trial proceedings pursuant to 28 U.S.C. § 1407.

Defendants move to dismiss on numerous grounds. Defendant CINAR moves to dismiss the Consolidated and Amended Class Action Complaint ("Class Action Complaint" or "CAC") and the *Kelley* Complaint on grounds of comity and forum non conveniens. Defendants Ronald A. Weinberg and Micheline Charest move to

dismiss the Class Action Complaint and *Kelley* Complaint on grounds of comity and forum non conveniens and move to dismiss the *Kelley* Complaint on additional grounds of insufficient service of process and failure to state a claim of fraud.[1] Defendant Marie–Josée Corbeil moves to dismiss the Class Action Complaint on grounds of comity, forum non conveniens and lack of personal jurisdiction. Defendant Ernst & Young moves to dismiss the Class Action Complaint on grounds of comity, forum non conveniens and failure to comply with Rule 9(b). CINAR moves to dismiss the *Carson* Complaint on grounds of comity, forum non conveniens and failure to state a claim under the North Carolina Unfair Trade Practices Act. Weinberg and Charest move to dismiss the *Carson* Complaint on grounds of comity, forum non conveniens and failure to state a claim of fraud. Defendant Panju moves to dismiss the *Carson* Complaint on grounds of comity, forum non conveniens, lack of personal jurisdiction, failure to comply with Rule 9(b), failure to state a claim of control person liability under Section 20(b) of the Exchange Act and failure to state a claim of fraud. Finally, CINAR moves to dismiss the *Hilderbrand* Complaint on grounds of comity and forum non conveniens.

## BACKGROUND

### The Defendants

Defendant CINAR is a Canadian corporation that develops, produces and distributes non-violent programming and educational materials for children both in Canada and abroad. Founded in 1976, it is incorporated under the laws of Quebec and maintains its principal place of business in Montreal, Quebec, Canada. CINAR Holdings, Inc. and CINAR Education, Inc., both incorporated in Delaware, are wholly owned subsidiaries of CINAR.

Defendants Ronald A. Weinberg and Micheline Charest, a married couple, co-founded CINAR. From 1994 until 2000 Weinberg served as CINAR's President and Co–Chief Executive Officer, and Charest served as its Chairman of the Board and Co–Chief Executive Officer. Both became Directors of CINAR in 1984 and were members of the Management Committee.

Defendant Hasanain Panju became CINAR's Corporate Comptroller in 1994 and was then made Vice–President of Finance in 1995. In 1996, Panju was named CINAR's Chief Financial Officer. Panju became a Director of CINAR in 1995 and was a member of the Management Committee.

Defendant Marie–Josée Corbeil was a Vice–President of CINAR and served as its General Counsel. Corbeil was also a Director of CINAR and a member of the Management Committee.

Defendant Ernst & Young ("E & Y") served as CINAR's outside auditors since 1992 and audited its financial statements

---

1. In their original memorandum of law in support of their motion to dismiss, Weinberg and Charest argued further that the *Kelley* Complaint failed to comply with Rule 9(b), failed to state a claim for control person liability under Section 20(b) of the Exchange Act and failed to state a claim under the North Carolina Securities Act. These defendants also maintained that this Court lacked personal jurisdiction as grounds to dismiss both the Class Action Complaint and the *Kelley* Complaint. After reviewing the affidavit of Peter Lerner and the Kelley Plaintiffs' Amended Complaint alleging further jurisdictional facts, defendants withdrew their objection to the Court's exercise of personal jurisdiction and abandoned the aforementioned arguments with respect to the *Kelley* Complaint in their reply brief. *See* Reply Mem. of Law in Supp. of Defs. Weinberg and Charest's Mot. to Dismiss at 1–2 & nn. 1–2.

for the fiscal years ending November 30, 1997 and November 30, 1998. E & Y's unqualified audit opinions on CINAR's 1997 and 1998 financial statements appeared in the 1999 Registration Statement, which gives rise to several of the class action claims.

### In re CINAR [2]

CINAR became a publically-traded company in September 1993. CINAR initially sold its shares only on the Montreal and Toronto exchanges, but it began trading in the United States on the NASDAQ in July 1994. Since 1994, CINAR has issued stock in four subsequent offerings: in April 1995, in July 1996, in September 1997 and in March 1999. *See id.* ¶ 44. In connection with these stock issuances, Weinberg and Charest made several trips to New York and North Carolina, among other places, to attend meetings with investors and to participate in "road shows" designed to promote CINAR stock in the United States. *See* Aff. of Peter Lerner ¶¶ 4, 5A. The last two of these offerings, which fell within the period from April 1997 to March 2000 that is the subject of this class action, were largely directed to buyers in the United States. Under the terms of the Underwriting Agreement for the September 1997 stock offering, the U.S./International Underwriters were to sell 2.7 million of the 3.1 million shares issued and were prohibited from selling in Canada or to Canadian citizens. Under a similar agreement for the March 1999 stock offering, the same underwriters were to sell more than 5.4 million of the 7 million shares issued and were again forbidden to sell in Canada or to Canadian citizens. *See* CAC ¶¶ 18, 44.

Over the course of that same time period, CINAR issued several press releases, published financial reports and submitted SEC filings, all of which form the basis for the Class Plaintiffs' causes of action. The gravamen of the Class Action Complaint is that these statements and releases contained inflated estimates of CINAR's financial position because they took into account improperly claimed tax credits and did not record unauthorized related party transactions and off-shore investments. CAC ¶¶ 3, 108–09. This information began to surface on October 15, 1999, when press reports circulated that Canadian authorities were conducting an investigation into alleged tax fraud on the part of CINAR. The investigation focused on whether CINAR had availed itself illegally of an incentive plan that granted tax credits to Canadian television productions that programmed Canadian-authored content. According to the reports, CINAR had falsely attributed several scripts written by American authors to Canadians in order to receive the tax benefit. CINAR's Class B stock price dropped from $28.00 per share to $22.125 per share by the close of the day's trading.[3] In response to this decline, CINAR announced that any tax liability would be minimal and that its Audit Committee would conduct an inquiry into the matter. CINAR's stock price gradually rose again to $27.3875 per share as of February 18, 2000. *See* CAC ¶¶ 5–7.

On February 18, 2000, CINAR issued a press release stating that the "financial and accounting impacts" of its investigation would be "greater than initially anticipated." CAC ¶ 8. CINAR's stock price once again fell, experiencing a one-day loss of 27%, down to $17.9375 per share from $24.625 per share. On March 6, 2000, CINAR announced that its investigation

---

2. With the exception of the causes of action, the facts of *In re CINAR* are, in relevant part, identical to those alleged in the remaining three actions.

3. All dollar amounts are in U.S. dollars unless otherwise specified.

had determined that "approximately U.S. $122 million of its funds had been invested overseas without the approval of its Board of Directors" and that continued inquiry into these matters might cause CINAR to miss the deadline to file its 1999 financial statements. CAC ¶ 9. The March 6 release further stated that defendant Panju had been terminated as an officer and employee of the Company. The fallout from this disclosure was immediate. Defendants Weinberg and Charest resigned as Co–Chief Executive Officers and CINAR's stock price once again dropped precipitously, down $12.62 per share to close at $5.75 per share by the end of trading on March 7—a 70% one-day loss. Canadian and American stock exchanges stopped all trading of CINAR stock on March 8, 2000, and on March 10, 2000, CINAR announced that it would be revising its financial reports for fiscal years 1997 and 1998 and the first three quarters of fiscal year 1999 due to evidence of tax fraud, non-disclosure of related party transactions and unauthorized investments revealed by its internal investigation. *See id.* ¶¶ 8–12.

As a result of these disclosures, Canada Customs and Revenue Agency and the Quebec provincial tax authorities initiated civil investigations into CINAR's improperly obtained tax credits. The Royal Canadian Mounted Police ("RCMP") also commenced criminal investigations concerning possible tax fraud and, in April 2000, filed court papers in connection with its investigation alleging that CINAR had improperly received $7.8 million (Cdn.) in tax credits. CAC ¶ 48. During the course of these investigations and those by CINAR's Audit Committee, it was discovered that CINAR had indeed obtained tax credits to which it was not entitled. The inves-

tigations revealed that Helene Charest, the sister of defendant Micheline Charest and a Canadian citizen, had signed several American authored scripts under the pseudonym "Erica Alexandre," a name formed from the names of Weinberg and Charest's two children. The investigations further revealed that Thomas LaPierre also lent his name to American authored scripts.[4] LaPierre also claims that the defendants asked him to draw up sub-contracts for American authors. CAC ¶¶ 46–47. On December 19, 2000, CINAR admitted that it had improperly obtained tax credits and announced that it had agreed to pay the Canadian federal government approximately $5.1 million (Cdn.), abandon all claims for tax credits equaling roughly $6 million (Cdn.) and acknowledge an additional tax liability of approximately $3.7 million (Cdn.). CINAR also announced that it had agreed to pay the Quebec government roughly $7.9 million (Cdn.), abandon claims for tax credits equaling $3.6 million (Cdn.) and acknowledge an additional tax liability of approximately $1.1 million (Cdn.). *See* Aff. of Neil L. Selinger, Ex.1 ("Selinger Aff. ___").[5]

The class action plaintiffs ("Class Plaintiffs") bring suit on behalf of themselves and a class of all persons who purchased shares of CINAR Class B stock on the NASDAQ exchange from April 8, 1997, when CINAR announced its financial results for the first quarter ending February 28, 1997, through and including March 10, 2000 and on behalf of two sub-classes: (1) all persons who purchased CINAR stock issued in the 1997 Offering pursuant to the 1997 Registration Statement and through the U.S./International Underwriters as defined therein and (2) all persons who pur-

---

4. Thomas LaPierre is the son of Laurier LaPierre, Chairman of Telefilm Canada, an agency which funds bona fide Canadian productions.

5. Although CINAR admitted to improperly obtaining tax credits, it did not concede that it did so with an intent to defraud.

chased CINAR stock issued in the 1999 Offering pursuant to the 1999 Registration Statement and through the U.S./International Underwriters as defined therein. CAC ¶ 33. Plaintiffs allege that defendants misled the investing public by issuing materially false financial statements, press releases and other public filings concerning CINAR's financial position. Plaintiffs specifically target CINAR's 1997 and 1999 SEC Registration Statements in which the defendants submitted false statements in connection with offerings of 3.1 million Class B shares in 1997 and 7 million Class B shares in 1999, the vast majority of which were sold to United States or other non-Canadian citizens. According to plaintiffs, these filings overstated CINAR's revenues and earnings, neglected to disclose unauthorized offshore investments and failed to record related party transactions in accordance with U.S. and Canadian Generally Accepted Accounting Principles ("GAAP"). Such misstatements, it is alleged, artificially inflated CINAR's stock price and constituted fraud-on-the-market.

Class Plaintiffs plead eight causes of action against CINAR, Weinberg, Charest, Panju, Corbeil and CINAR's auditors, E & Y. Count One alleges that CINAR, Weinberg, Charest and Panju violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. 240.10b–5. Count Two alleges that Weinberg, Charest and Panju were "controlling persons" of CINAR and are liable under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Counts Three, Four and Five allege that some or all of defendants CINAR, Weinberg, Charest and Panju are liable under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77k(a), 77l(a)(2), 77o, for omissions and misstatements in the 1997 Registration Statement. Counts Six, Seven and Eight allege that some or all of defendants CINAR, Weinberg, Charest, Panju, Corbeil and E & Y are liable under Sections 11, 12(a)(2), and 15 of the Securities Act for omissions and misstatements in the 1999 Registration Statement.

### Kelley v. CINAR

In 1986, Phillip Kelley, Kathy Kelley, Michael Mayberry and Sharon Mayberry (the "Kelley Plaintiffs") founded HighReach Learning, Inc. ("HighReach"), a North Carolina company that manufactures and distributes children's educational materials. Each of the four plaintiffs owned twenty-five percent of the company's stock. In January 1998, CINAR and CINAR's wholly owned Delaware subsidiary, CINAR Education, offered to purchase HighReach. The companies entered into negotiations. Defendant Weinberg, who represented CINAR in this transaction, traveled to North Carolina and New York on several occasions to arrange the deal. During these negotiations, Weinberg provided the Kelley Plaintiffs with copies of CINAR's financial statements and represented that they reflected an accurate picture of the Company's financial position. See Kelley Am. Compl. ¶¶ 13–20.

On May 26, 1998, CINAR and the Kelley Plaintiffs finalized the deal and signed a Stock Purchase Agreement ("Kelley SPA"). According to the Kelley SPA, the Kelley Plaintiffs sold 689 shares of HighReach stock to CINAR Education in exchange for $18 million in cash, and sold the remaining 311 shares to CINAR for 422,000 shares of CINAR Class B stock. At the time, CINAR Class B stock was trading at $19 per share. CINAR represented in the Kelley SPA that their SEC filings "did not contain any untrue statement of a material fact" and that the financial statements included in the SEC filings "fairly present[ed] the consolidated financial position of CINAR." Id. ¶¶ 24–25. It

was further stipulated that all representations and warranties made by CINAR in the Kelley SPA would continue for three years after the closing date. *Id.* ¶ 27. After the disclosures of October 1999 through March 2000 described above, CINAR's stock price tumbled and the NASDAQ halted trading. Plaintiffs claim that the fraudulent financial statements artificially inflated CINAR's stock price and allowed CINAR to exchange fewer of its Class B shares in its purchase of HighReach.

The Kelley Plaintiffs plead six causes of action against CINAR, Weinberg and Charest. Count One alleges that CINAR, Weinberg and Charest violated Section 10(b) of the Exchange Act. Count Two alleges that Weinberg and Charest were "controlling persons" of CINAR and are liable under Section 20(a) of the Exchange Act. Count Three alleges that all defendants violated the North Carolina Securities Act, N.C. Gen.Stat. § 78A–1, *et seq.* Counts Four and Five allege common law fraud and negligent misrepresentation against all defendants. Count Six alleges breach of contract against CINAR.

### Carson v. CINAR

In 1976, Stephen Carson, Patricia Carson and Janet Dellosa (the "Carson Plaintiffs") founded Carson–Dellosa Publishing Inc. ("Carson–Dellosa"), a North Carolina company that produces and distributes educational materials for classroom use. In 1996, CINAR approached the Carson Plaintiffs to purchase Carson–Dellosa as well as two other companies in which the Carson Plaintiffs had an interest, The Wild Goose Company ("Wild Goose") and Unique Collating Service, Inc. ("Unique"). At various times in 1997, Weinberg, Charest and Panju traveled to North Carolina to convince the Carson Plaintiffs to sell Carson–Dellosa. Plaintiffs allege that throughout this period they were in frequent contact with both Weinberg and Panju by phone. During negotiations, defendants made several representations to the Carson Plaintiffs concerning the soundness of CINAR's financial position and stock price. For example, despite plaintiffs' desire to receive cash for the sale of Carson–Dellosa, Weinberg and Panju both told plaintiffs that it would be a better financial decision to accept CINAR stock in lieu of cash. Weinberg and Panju urged plaintiffs to consider CINAR's recent market performance as an indication of the projected future value of its stock and stated that, based on the facts known to them, they expected the value of CINAR stock to rise over the next two to three years. Defendants also provided plaintiffs with several of CINAR's financial reports, including the CINAR Annual Reports for 1994, 1995 and 1996, Management Proxy Circulars from 1995, 1996 and 1997, and the 1997 Interim Report for the First Quarter ending February 28, 1997, all of which plaintiffs claim misstated CINAR's financial position for the reasons already explained. *See* Carson Am. Compl. ¶¶ 14–22.

Relying on these statements and the accuracy of the market price of CINAR stock, the Carson Plaintiffs agreed to sell their interest in Carson–Dellosa to CINAR and CINAR Holdings in exchange for $22,151,100 in cash and CINAR stock then worth $16 million. Plaintiffs also sold their interest in Wild Goose and Unique to CINAR for cash, bringing the transaction's total value up to approximately 40.5 million. On July 28, 1997, the two parties set out these terms in a Stock Purchase Agreement ("Carson SPA") executed in North Carolina in which CINAR expressly warranted the accuracy of its financial statements and SEC filings. *Id.* ¶¶ 29–36. The Carson SPA expressly stated that "all forms, reports, registration statements and documents required to be filed by [CINAR] with the [SEC] … did not contain

any untrue statement of a material fact or fail to state a material fact required to be stated therein" and that "[t]he audited financial statements and audited interim financial statements included [in the SEC filings] . . . fairly present the consolidated financial position of CINAR." *Id.* ¶¶ 36–37. CINAR also represented in the Carson SPA that since November 30, 1996, there had been no "material adverse change" to CINAR's business. *Id.* ¶ 38. As part of the transaction, the Carson Plaintiffs also entered into employment contracts with Carson–Dellosa that prohibited them from competing with Carson–Dellosa anywhere in the world for two years after termination of their employment. *See id.* ¶ 35. After the disclosures of October 1999 through March 2000 described above, CINAR's stock price fell drastically. Plaintiffs claim that defendants fraudulently induced them to enter into the Carson SPA by knowingly making false representations in their financial statements and in other disclosures.

The Carson Plaintiffs plead eight causes of action against CINAR, Weinberg, Charest and Panju. Count One alleges that CINAR, Weinberg, Charest and Panju violated Section 10(b) of the Exchange Act. Count Two alleges that Weinberg, Charest and Panju were "controlling persons" of CINAR and are liable under Section 20(a) of the Exchange Act. Count Three alleges that all defendants violated the North Carolina Securities Act. Counts Four and Five allege common law fraud and negligent misrepresentation against all defendants. Count Six alleges breach of contract against CINAR. Count Seven alleges that Weinberg, Charest and Panju aided and abetted fraud. Count Eight alleges violation of the North Carolina Unfair Trade Practices Act against all defendants, N.C. Gen.Stat. § 75–1.1.

### *Hilderbrand v. CINAR*

In 1987, Karen Hilderbrand and Kim Thompson (the "Hilderbrand Plaintiffs") founded Twin Sisters Productions ("Twin Sisters"), an Ohio company that produces and distributes children's educational materials and musical products. *See* Hilderbrand Compl. ¶ 16. In the middle of 1999, CINAR and CINAR Education approached the Hilderbrand Plaintiffs to express their interest in purchasing Twin Sisters, which already had been approached by a rival company, IFG. From that time through February 2000, defendant Panju was in contact with plaintiffs by telephone and met with plaintiffs on several occasions, including once in Ohio. Defendant Weinberg also met with plaintiffs in Montreal and Ohio. Both Panju and Weinberg represented that defendant Charest had knowledge of the terms of sale as proposed by Panju and Weinberg. When both CINAR and IFG offered a purchase price of $9 million, CINAR further offered to pay the Hilderbrand Plaintiffs $2.5 million in additional consideration over the course of four years if Twin Sisters met particular earning targets for each year and if the Hilderbrand Plaintiffs relinquished their pre-existing royalty agreements. The earning targets were calculated on the basis of the past performance of Twin Sisters and factored in a projected increase that would result from promised capital contributions and a central distribution center, each to be supplied by CINAR following the sale. The additional consideration would be in the form of CINAR stock. CINAR further offered to retain the Hilderbrand Plaintiffs as employees of Twin Sisters after the sale and pay them CINAR stock options as part of their employment agreements. *See id.* ¶¶ 24–33, 44–48.

On February 22, 2000, the parties executed a Stock Purchase Agreement ("Hil-

derbrand SPA") and two Employment Agreements ("Hilderbrand EAs") setting out these terms. Plaintiffs claim that during the negotiations over the Hilderbrand SPA and Hilderbrand EAs defendant Panju, with the knowledge and consent of Weinberg and Charest, made several false statements concerning CINAR's financial position and, in doing so, fraudulently induced them into signing the agreements. These included promises of a new distribution center and financial backing, as well as oral assurances by defendant Panju that the various financial statements of 1997 and 1998 provided to the Hilderbrand Plaintiffs represented an accurate picture of CINAR's financial health and that the reports of tax fraud that had begun to circulate at that time were baseless. *See id.* ¶¶ 28, 35–42.

The Hilderbrand Plaintiffs plead three causes of action against CINAR, Weinberg, Charest and Panju. Counts One and Two allege common law fraud and negligent misrepresentation. Count Three alleges grounds for a preliminary injunction to preclude CINAR from selling its educational division, including Twin Sisters, until the Hilderbrand SPA and the Hilderbrand EA are reformed to provide for payment of additional consideration.

## DISCUSSION

■ When considering a motion to dismiss under Rule 9(b) or Rule 12(b)(6), a court must presume the facts alleged in the complaint to be true, and draw all factual inferences in favor of the plaintiff. *In re Livent, Inc. Sec. Litig.*, 78 F.Supp.2d 194, 199–200 (S.D.N.Y.1999). This presumption is inapplicable, however, to motions to dismiss on grounds of internation-

al comity and forum non conveniens which address the court's subject matter jurisdiction. *See id.* at 200 ("The presumption on factual inferences does not apply to a forum non conveniens motion."). Accordingly, the Court may take into account "the pleadings and any evidence before it, such as affidavits." *Id.* (quoting *Cargill Int'l S.A. v. M/T PAVEL DYBENKO*, 991 F.2d 1012, 1019 (2d Cir.1993)).

### A. *International Comity* [6]

Defendants argue that all of the actions before the Court are inherently Canadian disputes and should be dismissed for reasons of international comity in favor of a class action already proceeding in Canada. Defendants contend that resolution of the case will involve interpreting complex provisions of the Canadian and Quebec tax laws—a task that is better left to Canadian courts. In exercising jurisdiction, the Court may also risk entanglement with ongoing Canadian civil and criminal investigations into CINAR's conduct. In addition, because the tax credit program is a hotly-contested and widely-publicized political issue in Canada, the Court would be injecting itself into a volatile local controversy. Plaintiffs counter that the focus of their respective complaints is not CINAR's duplicity with Canadian tax authorities, but rather the fraudulent statements made to American investors in connection with their secondary stock offerings on the NASDAQ and stock purchase agreements with American companies. Thus, according to plaintiffs, the actions have an American locus rather than a Canadian one. Moreover, plaintiffs observe that the Court will not have to interpret Canadian tax

---

**6.** Every defendant bringing a motion to dismiss raises international comity and forum non conveniens arguments. Because the points made by the defendants are substantially similar, the Court considers at once all arguments made by each defendant concern-

ing these two issues. For the sake of clarity, the Court then addresses the remaining grounds for dismissal on a motion-by-motion basis, although it should be noted that there is considerable overlap.

laws because CINAR has already admitted to Canadian authorities that it improperly received tax credits.

The Supreme Court defined comity as "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation." *Hilton v. Guyot*, 159 U.S. 113, 164, 16 S.Ct. 139, 40 L.Ed. 95 (1895). According to this principle, "United States courts ordinarily refuse to review acts of foreign governments and defer to proceedings taking place in foreign countries, allowing these acts and proceedings to have extraterritorial effect in the United States." *Pravin Banker Assocs. v. Banco Popular Del Peru*, 109 F.3d 850, 854 (2d Cir.1997). Courts should take special care to avoid potential conflicts and entanglements in the area of international relations. *See In re Maxwell Communication Corp.*, 93 F.3d 1036, 1047 (2d Cir.1996). Courts will not yield to foreign proceedings, however, if deferring would "be contrary to the policies or prejudicial to the interests of the United States." *Pravin*, 109 F.3d at 854.

The parties dispute the governing standard for dismissal on grounds of international comity. Plaintiffs contend that defendants must first demonstrate that a "true conflict" exists between United States law and Canadian law such that it would be impossible for a person to comply with the directives of both. Only after the defendants have satisfied this threshold inquiry is the Court then to assess the strength of each country's interest in the litigation according to a seven factor balancing test outlined in the Restatement (Third) of Foreign Relations. *See* Class Pls.' Mem. of Law in Opp'n at 24–25 ("Class Pls.' Opp. at ___"). Defendants maintain that a "true conflict" need not exist for the Court to dismiss and that the correct balancing test to apply is not the Restatement factors, but rather the seven factor inquiry set out in *Timberlane Lum-*ber Co. v. Bank of America, 749 F.2d 1378 (9th Cir.1984). *See* Def. CINAR Corp.'s Reply Mem. of Law in Supp. at 2–8 ("CINAR Reply at ___").

### 1. "True Conflict"

■ In *In re Maxwell*, the Second Circuit stated that a "true conflict" is, indeed, a threshold requirement and that such a conflict exists between two countries only if the laws of one "require conduct that violates [the laws of the other]." *In re Maxwell*, 93 F.3d at 1049–50. In adopting this requirement, the *In re Maxwell* court relied on the Supreme Court's decision in *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 798–99, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993). In *Hartford Fire*, the Supreme Court declined to dismiss the suit on grounds of comity, thereby allowing application of the Sherman Act to London reinsurers. *See id.* After finding that no true conflict existed because it was possible "[to] comply with the laws of both [the United States and Britain]," the Court refused to deliberate further on the issue, stating "[w]e have no need in this litigation to address other considerations that might inform a decision to refrain from the exercise of jurisdiction on grounds of international comity." *Id.* at 799, 113 S.Ct. 2891.

The crux of the "true conflict" dispute lies in the interpretation of this statement. Defendants argue that the Court's mention of "other considerations" indicates that there are contexts in which a "true conflict" is not necessary for courts to abstain. In support, defendants cite a pre-*In re Maxwell* case that refused to extend the "true conflict" requirement to trademark cases. *See Sterling Drug, Inc. v. Bayer*, 14 F.3d 733, 746–47 (2d Cir.1994) (stating "[t]hough the Court's approach to the comity issue might not be limited to the antitrust context, we think it is not automatically transferable to the trademark

context.") (cited with approval in *In re Maxwell*). Plaintiffs counter that this is merely a refusal by the Court to analyze the balancing test factors because the lack of a true conflict was dispositive of the issue. *See* Carson Pls.' Mem. of Law in Opp'n at 9–10.

The Court agrees with plaintiffs' position. At least one court in the Second Circuit has agreed with this interpretation. *See Trugman–Nash, Inc. v. New Zealand Dairy Bd.,* 954 F.Supp. 733, 737 (S.D.N.Y. 1997). Moreover, even if *Sterling Drug* leaves open the possibility that some contexts might not require a "true conflict," no court in the Second Circuit has held that securities fraud cases like this invite such special considerations.[7] Finally, ever since *In re Maxwell,* courts in the Second Circuit have been consistent in affirming a "true conflict" threshold. *See Filetech v. France Telecom,* 157 F.3d 922, 932 (2d Cir.1998); *Bodner v. Banque Paribas,* 114 F.Supp.2d 117, 129–30 (E.D.N.Y.2000); *Trugman–Nash,* 954 F.Supp. at 736–37. Defendants' citation of *Bigio v. Coca–Cola Co.,* 239 F.3d 440 (2d Cir.2000); *Jota v. Texaco, Inc.,* 157 F.3d 153 (2d Cir.1998) and *Pravin* in support of their argument is unpersuasive. While these cases do not specifically mention a "true conflict" requirement, they do not refute it either. *See Bigio,* 239 F.3d at 454–55; *Jota,* 157 F.3d at 160 (both stating that the district court on remand should consider whether the foreign court constitutes an adequate forum, but neglecting to mention the "true conflict" threshold); *see also Pravin,* 109 F.3d at 854–55 (affirming the district court's exercise of jurisdiction because declining to do so would have been contrary to United States policy, but not alluding to the existence of a "true conflict"). Defen-

dants do not maintain that it would be impossible for them to comply with both American securities law and Canadian tax law. Defendants are thus unable to meet the "true conflict" threshold, a fact that, by itself, would militate against dismissal. *See In re Maxwell,* 93 F.3d at 1049–50; *Hartford Fire,* 509 U.S. at 798–99, 113 S.Ct. 2891.

Even if the Court were to consider issues of potential conflict as only one factor in a multifaceted balancing test, as defendants suggest, defendants still cannot demonstrate a likelihood of significant conflict if proceedings were to continue in both countries. Defendants assert that, should the Court retain jurisdiction in this matter, it will be required to interpret complex Canadian tax laws. While it is undoubtedly true that Canadian courts have more experience interpreting these laws, there is no indication that this Court's application of those laws will conflict with previous Canadian precedent. Certainly this Court will not be called upon to apply laws that are in direct opposition to Canadian law. The point is therefore directed more to the Court's expertise in these matters— a concern that is more appropriately considered in a forum non conveniens analysis.[8] To the extent it impacts the comity analysis, though a valid concern, it does not create a conflict or circumstance meriting dismissal. *See Manu Int'l, S.A. v. Avon Prods., Inc.,* 641 F.2d 62, 67–68 (2d Cir.1981) ("[District courts] must guard against an excessive reluctance to undertake the task of deciding foreign law, a chore federal courts must often perform.").

More importantly, the extent to which this Court will be interpreting Canadian

---

**7.** Indeed, in a recent Tenth Circuit securities fraud case, the court, citing *Hartford Fire* and *In re Maxwell,* refused to engage in a comity analysis absent a finding of "true conflict." *See United Int'l Holdings, Inc. v. Wharf (Hold-*

*ings) Ltd.,* 210 F.3d 1207, 1223 (10th Cir. 2000).

**8.** *See* discussion *infra* Section B.

tax law is not great. CINAR has already admitted to Canadian authorities that it improperly claimed the tax credits at issue. *See* Selinger Aff., Ex. 1. It is entirely likely, given the scope of the admission, that the Court will not have to address whether CINAR's improperly claimed credits extended beyond what it already conceded. Defendants contend that despite CINAR's admission, issues still remain as to "scienter, due diligence and causation" that would require analysis of Canadian tax laws. As for issues related to damages and causation, plaintiffs correctly pointed out at oral argument that such issues would require expert testimony regardless of where the case was brought. *See* Tr. of Oral Argument at 14–15. With respect to scienter, it is true that CINAR's agreement with the Canadian tax authorities does not by itself prove that particular defendants acted with fraudulent intent. Nevertheless, deciding issues of intent is not as complex as deciding whether a company qualifies for a particular tax benefit. The question is simply whether they knew they were improperly claiming tax credits. Answering this hardly requires close familiarity with the intricacies of Canadian tax law.[9]

Defendants also claim that the Court's involvement could also compromise Canadian civil and criminal investigations, which have garnered considerable media attention in Canada. The Court does not see any serious conflict and defendants have offered only vague suggestions as to how it might occur, stating that "inconsistent or expansive rulings" might cause

problems. CINAR Reply at 13. A decision from this Court will do little to undermine Canadian civil investigations because CINAR has already reached a settlement with the regulatory authorities. *See* Selinger Aff., Ex. 1. In the unlikely event that this Court decides that CINAR's impropriety extended beyond what it has already conceded, it is difficult to see how such a ruling would cause enough tension to warrant a comity dismissal. Canadian civil authorities have already resolved the matter to their satisfaction. The possibility that this Court may decide that the Canadian government was entitled to a little more should not cause any great uproar. To the extent that a ruling of this Court may impact any Canadian criminal investigations, the Court finds that such concerns do not rise to a sufficient level to implicate concerns of comity. Moreover, Canadian authorities, to this point, have expressed no concerns with this Court's retention of jurisdiction.

### 2. Balancing Tests

██ Even if defendants could show that a "true conflict" exists or that a "true conflict" is not necessary for dismissal, they cannot demonstrate that the other comity factors weigh in favor of dismissal, regardless of which balancing test is used. Defendants contend that the applicable law in this circuit is the test found in *Timberlane*. Plaintiffs maintain that the controlling factors are found in the Restatement (Third) of Foreign Relations. The *In re Maxwell* court cited and applied the Re-

---

**9.** Defendants also claim that the Revenue Rule, which mandates that courts refrain from adjudicating cases where they will have to pass upon the validity of the revenue laws of foreign nations, counsels for dismissal. *See Moore v. Mitchell*, 30 F.2d 600, 603–04 (2d Cir.1929) (Hand, J., concurring). However, plaintiffs rightly point out that the Revenue Rule applies in cases where a foreign nation

seeks to enforce its tax laws in this country and is not a concern in this case. *See Her Majesty Queen in Right of Province of British Columbia v. Gilbertson*, 597 F.2d 1161, 1163 n. 1 (9th Cir.1979). The Court would not be commenting on the validity of the Canadian incentive scheme, but rather deciding whether the defendants' admitted abuse of that scheme defrauded American investors.

statement factors as controlling law. *See In re Maxwell,* 93 F.3d at 1048. However, courts in the Second Circuit, both before and after *In re Maxwell,* have applied or endorsed the *Timberlane* factors. *See O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana,* 830 F.2d 449, 451 (2d Cir.1987); *Trugman–Nash,* 954 F.Supp. at 737. The dispute is pointless for two reasons. First, the two tests are almost identical, for all intents and purposes. Indeed, the Second Circuit in *Filetech* seemed to indicate that the two tests should be read together as one seven-factored test. *See Filetech,* 157 F.3d at 928–29. Second, regardless of which test is used, the defendants cannot demonstrate that dismissal is warranted.

Under the *Timberlane* test the court must balance the following factors: (1) the degree of conflict with foreign law or policy, (2) the nationality or allegiance of the parties and the locations or principal places of business or corporations, (3) the extent to which enforcement by either state can be expected to achieve compliance, (4) the relative significance of effects on the United States as compared with those elsewhere, (5) the extent to which there is explicit purpose to harm or effect American commerce, (6) the foreseeability of such effect, and (7) the relative importance to the violations charged of conduct within the United States as compared with conduct abroad. *Timberlane,* 749 F.2d at 1383–86.[10]

The first of these factors (Restatement § 403(2)(h)) has already been addressed in the discussion of the "true conflict" threshold. No legitimate conflict exists with Canadian law or Canadian investigations. The Court adds only that the Restatement specifically mentions that the mere fact that one state has already begun judicial proceedings, while relevant to evaluating Sections 403(2)(g) and (h), does not automatically counsel for dismissal. *See* Restatement (Third) Foreign Relations Law § 403, Comment d. Moreover, the only parallel proceeding in Canada is the Canadian class action. No parallel Canadian suit exists for the *Kelley, Carson* or *Hilderbrand* plaintiffs' claims.

The second *Timberlane* factor favors neither side. CINAR is a Canadian company and the named defendants are all Canadian citizens. The plaintiffs are American citizens. CINAR's argument that the suit is about tax fraud and therefore has an entirely Canadian nexus is unpersuasive. The suit is rather about CINAR's fraudulent disclosures to American investors. There is just as much of an American nexus as there is a Canadian

**10.** The Court analyzes the *Timberlane* factors because they are the most sympathetic to the defendants' case. Reference is made to the parallel Restatement factors parenthetically and in the text of the opinion when applicable. The Restatement factors are: (a) the link of the activity to the regulating state, i.e., the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon the territory; (b) the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect; (c) the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which the other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted; (d) the existence of justified expectations that might be protected or hurt by the regulation; (e) the importance of the regulation to the international political, legal, or economic system; (f) the extent to which the regulation is consistent with the traditions of the international system; (g) the extent to which another state may have an interest in regulating the activity; and (h) the likelihood of conflict with regulation by another state. Restatement (Third) Foreign Relations Law § 403(2) (1986).

nexus. The Restatement test is even stronger on this point. While Section 403(2)(b) might be neutral like the second *Timberlane* factor, Section 403(2)(a) specifically looks for a link between "the *activity* and the territory of the regulating state." Restatement § 403(2)(a) (emphasis added). The relevant activity here was defendants' pursuit of American investors in the United States—listing its securities on the NASDAQ, attending "road shows," etc.— and its false statements to those same investors and to American authorities.

The third through sixth factors either favor the plaintiff or do not add significant weight to defendants' argument for dismissal. Both the United States and Canada could surely achieve compliance. The effect of the securities fraud was greater here than in Canada. CINAR's tax liability in Canada totaled $8.7 million, while its damage to American investors ranges in the hundreds of millions of dollars. *See* Tr. Oral Argument at 51. There is no indication that defendants explicitly sought to harm American commerce, but it is worth noting that defendants did target primarily American investors in the 1997 and 1999 stock offerings and specifically sought out American companies for acquisition. Moreover, defendants could easily foresee that by registering its securities on the NASDAQ and by negotiating stock purchase agreements with American companies in the United States, any fraudulent statements it made would certainly have an affect here. Thus, these four factors do little to support the case for dismissal.

Finally, the seventh factor favors maintaining jurisdiction. Once again, CINAR asserts that this case, at its core, implicates the validity of the Canadian tax credit scheme, and as such, the importance of this suit is far greater in Canada than in the United States. CINAR further argues that asserting jurisdiction in this suit would be placing American interests in

enforcing its securities laws over an issue of national importance to Canada and would seem to make any foreign fraud an American concern so long as it involved American investors. Again, defendants are alluding to a conflict that does not exist. This Court's ruling will not affect the debate over the tax credit scheme. Nor is the United States asserting jurisdiction over a primarily local dispute. To say the least, the fraud occurred here as much as it did in Canada. Accordingly, the United States has a legitimate interest in enforcing its securities laws. Thus, defendants have a fairly weak case for dismissal under the *Timberlane* test and an even weaker one under the Restatement. A dismissal on grounds of comity is therefore denied.

### B. Forum Non Conveniens

In contrast to international comity, the applicable standard for forum non conveniens dismissals is more established, having been outlined in the companion cases *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947) and *Koster v. (American) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 67 S.Ct. 828, 91 L.Ed. 1067 (1947). *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); *Guidi v. Inter–Continental Hotels Corp.*, 224 F.3d 142, 145–46 (2d Cir.2000). In order to prevail, the defendant must first show that an adequate alternative forum exists and is available to the plaintiffs. After this has been established, the Court must then balance the various public interest and private interest factors discussed in *Gilbert* to determine whether dismissal is warranted. *See Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 100 (2d Cir.2000); *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 46 (2d Cir.1996). The burden lies with the defendant, *see Wiwa*, 226 F.3d at 100, and it is considerable. "[T]he plaintiff's choice of

forum should rarely be disturbed." *Gilbert,* 330 U.S. at 508, 67 S.Ct. 839. Although the bar is not so high such that defendants must show "unusually extreme circumstances," *see Allstate Life Ins. Co. v. Linter Group Ltd.,* 994 F.2d 996, 1000–01 (2d Cir.1993), the plaintiff's choice of forum "will not be overcome unless the relevant private and public interest factors weigh heavily in favor of trial in the alternative forum." *R. Maganlal & Co. v. M.G. Chem. Co.,* 942 F.2d 164, 167 (2d Cir.1991); *Alfadda v. Fenn,* 159 F.3d 41, 46 (2d Cir. 1998) (citing *R. Maganlal* ). Ordinarily, a court should dismiss only if "the chosen forum would 'establish oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience.' " *Piper,* 454 U.S. at 241, 102 S.Ct. 252 (quoting *Koster,* 330 U.S. at 524, 67 S.Ct. 828).

### 1. Degree of Deference Owed to Plaintiffs' Chosen Forum

■ Recently the Second Circuit has devoted a great deal of attention to the question of how much deference is owed to a plaintiff's choice of forum. *See Guidi,* 224 F.3d at 145–47; *Wiwa,* 226 F.3d at 99–103; *DiRienzo v. Philip Servs. Corp.,* 232 F.3d 49, 60–63 (2d Cir.2000). Even more recently, the Second Circuit issued an en banc opinion to clarify, in light of these three decisions, the Circuit's position on the following question: "[W]hat degree of deference should the district court afford a United States plaintiff's choice of forum where that forum is different from the one in which the plaintiff resides[?]" *Iragorri v. United Techs. Corp.,* 274 F.3d 65, 69 (2d Cir.2001). Because the plaintiffs in the *Kelley, Carson* and *Hilderbrand* actions, as well as many of the Class Plaintiffs, reside outside of the Eastern District of New York, this Court must consider how *Iragorri* impacts the instant case.

The *Iragorri* Court was primarily concerned with differentiating between plaintiffs with genuine connections to the chosen forum and plaintiffs whose selection of a particular forum was "motivated by forum-shopping reasons." *Id.* at 71–72. As the court stated, "[W]e give greater deference to a plaintiff's forum choice to the extent that it was motivated by legitimate reasons . . . and diminishing deference to a plaintiff's forum choice to the extent that it was motivated by tactical advantage." *Id.* at 73. This sliding-scale approach yields a rather straightforward result for most of the plaintiffs involved in these actions. The Kelley Plaintiffs and the Carson Plaintiffs originally filed their respective law suits in their home fora—the Western District of North Carolina and the Middle District of North Carolina, respectively. These plaintiffs are before this Court only because their cases were consolidated and transferred here by the Judicial Panel on Multidistrict Litigation. The Hilderbrand Plaintiffs are similarly situated. Although they brought their action directly in the Eastern District of New York, instead of their home forum in Ohio, they did so only because the *Kelley* and *Carson* actions had already been consolidated with the class action and transferred to this Court. Rather than filing a law suit in their home forum that would invariably be transferred, the Hilderbrand Plaintiffs quite logically decided to avail themselves of diversity jurisdiction and file in this Court at the outset. *See* Hilderbrand Compl. ¶¶ 3–4. As anticipated, their action was consolidated with the others. Hence, the Kelley, Carson and Hilderbrand Plaintiffs are now before this Court for reasons that are entirely legitimate and their choice of forum is entitled to a high degree of deference. *See Iragorri,* 274 F.3d at 73.

■ The only plaintiffs that bear further scrutiny under the *Iragorri* standard are the Class Plaintiffs. Certainly it is true that many of the Class Plaintiffs do not reside in this district. Yet this fact

does not by itself indicate that they have come before this Court harboring an impermissible tactical motive of the sort frowned upon by the *Iragorri* court. To the contrary, they no doubt brought suit in this Court for the simple reason that defendants were amenable to suit here, and it was the most convenient for all plaintiffs involved. *See id.* at 72–73. Moreover, it bears repeating that it is the very nature and purpose of a class action to bring together far-flung litigants asserting claims based on common questions of law or fact to proceed in concert before a single court. Almost every class action will therefore have several plaintiffs from outside the forum. This does not mean, however, that the litigation bears no legitimate connection to the particular forum chosen. Indeed, *Philip Services* specifically refutes the position that plaintiffs' choice of forum in class action suits involving questions of federal law is entitled to less deference merely because the class could claim many potential "home fora" given the number of plaintiffs involved. *See Philip Servs.*, 232 F.3d at 60–62.

Finally, with respect to all plaintiffs in each of the four actions, the Court notes that it is well settled in this circuit that, in cases involving a choice between an American forum selected by American plaintiffs and a foreign forum, the "home forum," for the purposes of a forum non conveniens analysis, is any "United States court," regardless of whether each individual plaintiff resides in that forum. *Guidi*, 224 F.3d at 146 & n. 4; *Wiwa*, 226 F.3d at 103; *Philip Servs.*, 232 F.3d at 62. It is therefore immaterial that plaintiffs in this case come from New York, North Carolina, Ohio and other locations. They are all American citizens or entities and so, for the purposes of this inquiry, the Eastern District of New York may be considered their "home forum."

Accordingly, the Court finds that plaintiffs' choice of a United States forum is entitled to the high level of deference afforded to those who have a legitimate connection to the forum under the *Iragorri* standard. While this fact, alone, does not automatically resolve the forum non conveniens issue in favor of the plaintiffs, the defendants must now demonstrate that they will suffer a great deal of inconvenience to warrant a rejection of plaintiffs' choice of forum. Bearing in mind the great degree of deference plaintiffs are entitled to in this case, and defendants' corresponding burden to surmount it, the Court now proceeds with its forum non conveniens analysis.

### 2. Adequate Alternative Forum

■ "An alternative forum is adequate if: (1) the defendants are subject to service of process there; and (2) the forum permits 'litigation of the subject matter of the dispute.'" *Alfadda*, 159 F.3d at 45 (2d Cir.1998) (citing *Piper*, 454 U.S. at 254 n. 22, 102 S.Ct. 252). With respect to the second factor, an unfavorable difference of law is generally not enough, by itself, for a court to find the forum inadequate. Indeed, only if the remedy offered by the alternative forum is "so clearly inadequate or unsatisfactory that it is no remedy at all" would a forum be considered inadequate. *Piper*, 454 U.S. at 254, 102 S.Ct. 252; *Philip Servs.*, 232 F.3d at 57. There is no dispute that CINAR and the named defendants are amenable to process in Canada. There is considerable disagreement, however, over whether Canada will allow the claims of all plaintiffs to go forward.

Plaintiffs allege that because Canada does not recognize the "fraud-on-the-market" theory of liability, a substantial number of American litigants will be denied relief that they would otherwise be entitled

to in the United States. The "fraud-on-the-market" theory allows a plaintiff who has not read or otherwise relied upon the defendants' false statements or disclosures, but instead has depended solely upon the integrity of the financial markets, to bring a claim of fraud. The Class Plaintiffs allege that many of those in the class will have no basis for relief in Canada because they did not rely on any of CINAR's statements, but merely bought shares relying on the accuracy of the NASDAQ price. Thus, transferring the action to Canada will effectively deny them any remedy at all. That defendants contend that these plaintiffs will be able to join a Canadian class action suit is of no moment; they will still be unable to state a cognizable cause of action. Defendants counter by reiterating that a even an unfavorable change in the substantive law from forum to forum does not always necessitate retention of jurisdiction. *See Piper*, 454 U.S. at 249, 102 S.Ct. 252. They further argue that the mere fact that the Supreme Court has recognized the "fraud-on-the market" theory, *see Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), cannot possibly mean that the United States is now the only appropriate forum for securities fraud cases. They also cite a Canadian law expert who states that a remedy would be available for these plaintiffs if they could prove a causal relationship between the false statements and their injury.

In *Philip Services*, the Second Circuit recently was faced with a virtually identical case involving a Canadian metal processing company that sold stock on the NASDAQ and promoted its stock offerings by holding "road shows" in the United States. *See Philip Servs.*, 232 F.3d at 54–56. Philip Services allegedly misrepresen-

ted its income and value on these statements and was later forced to restate its income and earnings on several statements causing its top officers to resign and its stock prices to drop. *Id.* The court upheld the district court's determination that Canada was an adequate forum, but overturned the district court's dismissal for misapplying the *Gilbert* factors. *See id.* at 53–54. In recognizing the adequacy of a Canadian forum, the Second Circuit concluded that, despite procedural challenges, the suit could proceed. The Court declined to rule, however, on whether the absence of the "fraud-on-the-market" theory would render the forum inadequate because the argument was raised for the first time on appeal. *See id.* at 58 (stating that "the district court would have been in a better position to address [this argument] than we are."). Thus, although the Second Circuit may favor the position that the absence of "fraud-on-the-market" theory does not make a forum inadequate, it nevertheless left room for a district court to rule otherwise.[11]

The Court declines to so rule, however, if for no other reason than that finding a Canadian forum inadequate for not recognizing the "fraud-on-the-market" theory would essentially render the doctrine of forum non conveniens nugatory for securities fraud cases. Unless all plaintiffs could establish reliance on something other than the integrity of the stock price, these cases would necessarily require United States jurisdiction. This takes the flexibility out of a doctrine that is designed to be flexible and fact-dependent. *See id.* at 61 ("[T]he doctrine is one of pragmatism and flexibility rather than rigid, bright-line rules."); *Piper*, 454 U.S. at 249, 102 S.Ct. 252 ("[Prior] decisions have repeatedly emphasized the need to retain flexibility.").

11. At least one case holds that the absence of "fraud-on-the-market" theory does not create issues of inadequacy of forum. *See Trafton v.* *Deacon Barclays de Zoete Wedd Ltd.*, No. C 93–2758, 1994 WL 746199, at *12 (N.D.Cal. October 21, 1994).

Moreover, the Court need not stake out new ground in this case. Even if the defendants can reach the adequate forum threshold, the *Gilbert* factors counsel for retention of jurisdiction, yielding the same result.

Plaintiffs next contend that the various shortcomings of the Canadian system will bar suit for many, if not all, of the American plaintiffs or will require procedural mechanisms so cumbersome that it will be effectively impossible to maintain an action there. At this point, the dispute becomes a battle of experts. Plaintiffs' expert raises several concerns over the procedural adequacy of Canadian class actions. First, he claims that Canadian law does not allow nonnatural entities to bring class action suits, such that corporate entities like the lead plaintiff in the CINAR class action, The Kaufmann Fund, and individuals holding securities in "street name" will not be included in the class. Despite CINAR's willingness to "waive" any procedural bars on this ground, plaintiffs' expert maintains that Canadian courts may not recognize this waiver and refuse to allow them in the class. *See* Decl. of Simon V. Potter ¶¶ 14–27 ("Potter Decl. ___."). Defendants' expert counters that Canadian courts will admit into the class both corporate entities and those plaintiffs holding securities in street name because the procedural bar is not considered one which must be upheld as a matter of public order. Moreover, a Canadian court will not sua sponte refuse to accept the defendants' waiver of the procedural bar. Reply Decl. of H. Patrick Glenn ¶¶ 7–12 ("Glenn Reply ___.").

Defendants' expert also alleges that even if the corporate entities are not admitted into the class, they could still proceed under Article 59 of the Quebec Civil Code of Procedure, which does not ban corporate entities, by designating one of the corporations to act on behalf of all of them. *See* Decl. of H. Patrick Glenn ¶ 26 ("Glenn Decl. ___."). Plaintiffs characterize this mechanism as unwieldy and impracticable. *See* Potter Decl. ¶¶ 28–29. Second, plaintiffs' claim that because Quebec courts do not accept classes comprised of people from other provinces, it is highly likely that they will not certify a class that includes citizens of the United States. *See* Class Pls. Opp. at 20–21; Potter Decl. ¶¶ 34–38. Defendants claim that this is no longer the case in Quebec. *See* Glenn Reply ¶¶ 16–20. In the end, the extensive papers filed by both sides provide no evidence that is conclusive.

Legal precedent offers little additional help. United States courts hearing securities fraud cases have split on the issue. *Compare Derensis v. Coopers & Lybrand,* 930 F.Supp. 1003, 1007–09 (D.N.J.1996); *Trafton,* 1994 WL 746199, at *12 (both holding that Canadian class action procedures are inadequate) *with DeYoung v. Beddome,* 707 F.Supp. 132, 137 (S.D.N.Y. 1989) (finding in a securities fraud case that class and derivative forms of action similar to those in the United States existed in Canada to provide adequate relief). The Second Circuit in *Philip Services* did not discuss the issue at great length, but did find that securities fraud class actions would be able to proceed in Canada, despite the unavailability of the "fraud-on-the-market" theory to create commonality among the plaintiffs. *See Philip Servs.,* 232 F.3d at 59. It should be noted that, although the court did not specifically address the questions raised by the plaintiffs' expert, the plaintiffs in *Philip Services* included corporate entities and all were American citizens or companies. In spite of this, the Second Circuit had no trouble ruling that the forum was adequate. *See id.*[12] It is not necessary, however, to get

---

**12.** In addition, defendants argued both in their briefs and at oral argument that the

Court could condition its dismissal on the

caught up in analyzing the forum's adequacy in this case, as the *Gilbert* factors are dispositive of the forum non conveniens issue. Accordingly, the Court will assume, arguendo, that the Canadian forum is adequate and proceed to a discussion of the *Gilbert* factors.

### 3. Gilbert Factors

■ Even if defendants can establish that Canada provides an adequate forum, they cannot show that the weight of the *Gilbert* factors points in their favor. According to the Supreme Court in *Gilbert*, the public interest factors to be considered by the Court are: (1) administrative difficulties associated with court congestion; (2) the unfairness of imposing jury duty on a community with no relation to the litigation; (3) the local interest in having localized controversies decided at home; and (4) avoiding difficult problems in conflict of laws. *Philip Servs.*, 232 F.3d at 63 (quotation marks omitted). The private interest considerations are: (1) ease of access to the evidence; (2) the availability of compulsory process to compel the attendance of unwilling witnesses; (3) the cost of willing witnesses' attendance; (4) if relevant, the possibility of a view of the premises; and (5) all other factors that might make the trial quicker or less expensive. *Id.* at 66. In assessing these factors, the Court notes that it is a heavily fact-dependent inquiry and that no single factor is dispositive. *See id.* at 57.

The public interest factors strongly favor the plaintiffs in this case. Once again, CINAR's attempt to cast this suit as a purely Canadian dispute is unpersuasive. The United States has a great interest in adjudicating this case because it involves fraud on American investors, whom CINAR specifically targeted with stock offerings on the NASDAQ and stock purchase agreements with American companies. Although the decision to engage in tax fraud no doubt occurred in Canada, much of the conduct giving rise to these suits occurred in the United States. The tax fraud was only a prelude to misstated SEC filings and fraudulent financial reports dangled before American investors to attract their money.[13] All of the plaintiffs are American citizens, and although all of the defendants are Canadian citizens, United States courts have a great interest in providing relief to American citizens. *See Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London*, 940 F.Supp. 528, 539 (S.D.N.Y.1996). United States courts have a special interest in preserving the integrity of American financial markets as well—an interest that should be given due weight. *See Philip Servs.*, 232 F.3d at 65. As for the remain-

Canadian court's acceptance of jurisdiction. *See* Def. CINAR Corp.'s Mem. of Law in Supp. at 19–20; Tr. Oral Argument at 19–20. Doing so would allow this Court to re-exercise jurisdiction in the event the Canadian court refused to waive its procedural requirements, thus eliminating any concerns as to adequacy of forum. A recent Second Circuit opinion, states that district courts may continue to use this practice, but only if, after a complete analysis of the challenges presented by the foreign forum, the court holds a " 'justifiable belief' in the existence of an adequate alternative forum." *Bank of Credit and Commerce Int'l (OVERSEAS) Ltd. v. State Bank of Pakistan*, 273 F.3d 241, 248 (2d Cir.2001).

The court stated in no uncertain terms that "[c]onditions cannot transform an inadequate forum into an adequate one." *Id.* Accordingly, the conditions defendants propose do not release the Court from its obligation to assess the adequacy of the Canadian forum.

13. The American nexus is even more present in the *Kelley*, *Carson* and *Hilderbrand* suits. The negotiations between CINAR and these plaintiffs took place in North Carolina and Ohio. Moreover, CINAR's Delaware subsidiaries, CINAR Holdings and CINAR Education, played a substantial part in these transactions.

ing factors, given that there is such a substantial American nexus, an American jury would have an interest in the litigation. There is no likely conflict of laws because the Court will be applying, for the most part, United States securities law, not Canadian tax law as the defendants claim. To the extent that this Court will be asked to interpret Canadian law, as discussed above in the comity analysis, it does not create an issue of great concern.[14]

And finally, this Court fails to see how it is in the Canadian public interest to prevent American investors from seeking remedies in American courts for wrongs at least in part perpetrated on American soil. Foreign companies seeking American capital would be hard-pressed to state their case to potential investors if those investors did not enjoy ready access to their own courts and jurisprudence. Certainly American stock purchasers would feel more comfortable knowing that, should something go wrong with the transaction, they would not be faced with the possibility of journeying to Canada to protect their rights and secure an appropriate remedy.

Certain private law factors arguably favor the defendants. It is true that most of the documentary evidence is in Canada. This fact weighs only slightly in favor of dismissal as documents can easily be copied and shipped. *See R. Maganlal,* 942 F.2d at 168–69. The fact that they are in French and would need to be translated adds a little more weight to the balance. As for the cost to willing witnesses, none of the defendants has indicated that it will be too expensive or inconvenient for them to appear if the trial is in New York. Indeed, it would be disingenuous for them to make such a claim, given their frequent trips to the United States to negotiate the stock purchase agreements and to attend the "road shows."

The availability of compulsory process is a stronger point for the defendants, however. Defendants maintain that there are several non-party witnesses who could not be compelled to appear in New York. They claim that despite CINAR's admission, these people have evidence relevant to scienter and other issues that will arise at trial. Plaintiffs contend that these people are non-essential witnesses and that any evidence they might have could be fairly given via taped deposition testimony at trial. Defendant E & Y particularly disputes this position, stating that these witnesses are indispensable for addressing the charges against them and that videotape depositions are not adequate for this purpose. *See* E & Y Mot. at 26–28; Tr. Oral Argument at 57–58. This factor is the strongest point defendants have in their favor. Case law does support the notion that live witness testimony is important especially when the issue of witness credibility is critical to the outcome of the case. *See Philip Servs.,* 232 F.3d at 66–67; *Iragorri,* 274 F.3d at 75; *Alfadda,* 159 F.3d at 48. Yet this one factor, taken with the rest of the private law factors is still not enough to tilt the balance in defendants' favor. When combined with the great weight of the public law factors, the balance certainly does not "weigh heavily in favor of trial in the alternative forum," *R. Maganlal,* 942 F.2d at 167. Moreover, given the strong presumption in favor of plaintiff's choice of forum that this Court must adopt in light of *Iragorri,* defendants have not met their burden. Their motion

---

**14.** The Court recognizes that, with respect to the claims against defendant E & Y, it may be required to apply Canadian GAAS, rather than American standards. *See* Mem. in Supp. of Mot. to Dismiss by Def. Ernst & Young at 20–21 ("E & Y Mot. at ___"). Although there are differences between the two, *see* Decl. of Boris Pavlin ¶¶ 4–6, the Court is confident that the discrepancies will not cause undue difficulty.

for dismissal for forum non conveniens must be denied.

## C. Weinberg and Charest's Motion to Dismiss the Kelley Complaint

### 1. Failure to State a Claim of Fraud

Defendants Weinberg and Charest contend that because the representations and warranties, which form the sole basis of the Kelley Plaintiffs' claim of fraud, are contained within the Kelley SPA itself, any breach of these representations is a breach of contract, and does not constitute fraud. They argue that plaintiffs' failure to state a claim for fraud therefore eliminates Counts One though Five of the *Kelley* Complaint, leaving only a claim for breach of contract against CINAR (Count Six). The Kelley Plaintiffs counter that the representations at issue were made prior to executing the Kelley SPA as an inducement to enter into the agreement, and therefore can serve as the basis for a fraud claim.

Under New York law,[15] when claims for fraud and breach of contract arise out of the same facts, in order to state a claim for fraud that is not duplicative of the contract action, "plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir.1996) (citations omitted). It is insufficient for the plaintiff to allege simply that the defendants never intended to be bound by the representations in the contract or never intended to perform. That is a misrepresentation of future in-

tent that alone does not constitute fraud, but merely breach of contract. *Id.* at 19–20; *Int'l CableTel Inc. v. Le Groupe Videotron Ltee*, 978 F.Supp. 483, 486–87 (S.D.N.Y.1997). On the other hand, "a misrepresentation of *present fact*, not of future intent, collateral or extraneous to the contract, but which is an inducement to the contract, can give rise to a separate claim of fraud." *D.S. America (East), Inc. v. Chromagrafx Imaging Sys., Inc.*, 873 F.Supp. 786, 796 (E.D.N.Y. 1995) (emphasis added) (citing *Deerfield Communications Corp. v. Chesebrough–Ponds, Inc.*, 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88, 502 N.E.2d 1003 (1986)).

Weinberg and Charest's misrepresentations are certainly ones of present fact and not of future intention. Their statements concerned the present financial status of the Company and did not conceal an intention to shirk their contractual obligations. To the contrary, Weinberg and Charest had every intention to execute the terms of the Kelley SPA, and did so by purchasing HighReach in exchange for CINAR stock and cash, as the Kelley SPA stipulated. Indeed, it was their prior assurances that persuaded the Kelley Plaintiffs to accept CINAR stock as part of the consideration for the sale of HighReach. The instant case readily falls in line with those cases where the courts refused to dismiss plaintiff's fraud claim because defendant induced plaintiff to enter the contract with fraudulent misstatements of fact. *See, e.g., First Bank of the Americas v. Motor Car Funding, Inc.*, 257 A.D.2d 287, 292, 690 N.Y.S.2d 17, 21 (N.Y.App. Div.1999) (allowing plaintiff's fraud claim to survive alongside its contract claim because defendants mischaracterized facts about loans sold to plaintiff); *Stewart v. Jackson & Nash*, 976 F.2d 86, 89 (2d Cir. 1992) (allowing a fraud claim to survive

---

**15.** Defendants maintain that New York law governs the Kelley SPA, but that North Car-

olina law would yield the same result. The Kelley Plaintiffs take no position on this issue.

because the law firm hiring plaintiff falsely induced him to accept their offer of employment by stating that it served a particular client and was developing a practice in an area of law in which plaintiff specialized).

Perhaps realizing the difficulty of arguing this point, Weinberg and Charest instead assert that the misstatements were not "collateral or extraneous" to the contract and therefore do not provide grounds for an independent cause of action for fraud. Defendants point out that the misstatements cited by the Kelley Plaintiffs— representations that CINAR's SEC filings and financial statements were accurate— are repeated within the Kelley SPA itself. Thus, despite the fact that defendants made these same representations to the plaintiffs during negotiations before the Kelley SPA was executed, defendants argue that because they reappeared in the Kelley SPA the misstatements are no longer "collateral or extraneous" to the contract. In support, defendants cite the Kelley Complaint where plaintiffs aver that "[t]hese representations and warranties *were a material part of the parties' agreement* and a major inducement to the Kelley Plaintiffs to consummate the transaction." *See* Kelley Am. Compl. ¶ 26 (emphasis added).

This argument is unpersuasive. It simply cannot be the case that any statement, no matter how false or fraudulent or pivotal, may be absolved of its tortious impact simply by incorporating it verbatim into the language of a contract. Once you have told someone that you hold title to the Brooklyn Bridge to entice that person to buy it, executing a contract to sell it that states that you hold title to the Brooklyn Bridge does not make your prior statement any less fraudulent, nor does it convert the fraud into a breach of contract. *See First Bank,* 257 A.D.2d at 292, 690 N.Y.S.2d 17 (stating that a fraud claim "[is

not] rendered redundant by the fact that [the] alleged misrepresentations breached the warranties made by [defendant] in the Agreement."). As for the statement in the Kelley Complaint, the Kelley Plaintiffs were most likely endeavoring to stress that these were not de minimis, off-hand remarks, made in passing, but rather that they were instrumental in their decision to enter into the contract. Moreover, even if plaintiffs were alluding to the exact composition of the Kelley SPA, as discussed above, mere mention that the representations appeared in the agreement does not negate the previous fraud.

Finally, Weinberg and Charest attempt to argue that no cause of action exists against them as individuals because all actions taken by them were in their capacity as officers of CINAR. Accordingly, they cannot be held personally liable for the Company's breach of contract. While it is true that corporate officers are not individually liable for the corporation's breach of its contracts, they may be held liable for their own fraudulent acts even if these acts were undertaken in furtherance of the corporation's business. *Cohen v. Koenig,* 25 F.3d 1168, 1173 (2d Cir.1994). Because the fraud claims survive, defendants' argument is therefore unavailing.

### 2. Insufficient Service of Process

 Defendants claim that the Kelley Plaintiffs' method of service via Purolator Courier in Canada violated the Hague Convention, rendering the service ineffective. Rule 4(f) of the Federal Rules of Civil Procedure provides that service of process may be effected on persons outside the United States "by any internationally agreed means reasonably calculated to give notice, such as those means authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents ...." Fed.R.Civ.P. 4(f)(1). For those countries that have adopted the Convention, compliance with its methods

for service of process guarantees that service will be effective on persons abroad. *See Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 706, 108 S.Ct. 2104, 100 L.Ed.2d 722 (1988). Assuming that the Convention provides the only effective means of service in this case, an issue that this Court need not decide, plaintiffs have, indeed, followed the articulated procedures. Article 10 of the Hague Convention states, "Provided the State of destination does not object, the present Convention shall not interfere with ... the freedom to send judicial documents, by postal channels, directly to persons abroad ...." Hague Convention, art. 10 (cited in *Ackermann v. Levine,* 788 F.2d 830 (2d Cir. 1986)). The Second Circuit has specifically held that this applies to service of process. *Ackermann,* 788 F.2d at 839 n. 11.[16] Canada has not objected to service of process by "postal channels." *Heredia v. Transport S.A.S., Inc.,* 101 F.Supp.2d 158, 161 (S.D.N.Y.2000). Whether service by Purolator Courier counts as service by "postal channels" is a question this Court need not decide. The Kelley Plaintiffs have provided ample proof that in addition to serving defendants by Purolator Courier, they also served the defendants by International Express Mail, Return Receipt Requested, sent by the Clerk of the Court of the Western District of North Carolina. *See* Kelley Pls.' Mem. of Law in Opp'n, Ex. A. This constitutes proper service. *See* Fed.R.Civ.P. 4(f)(2)(C)(ii). Accordingly, plaintiffs' chosen method of service of process did not violate the Hague Convention.

---

**16.** The Court notes that, although the Fourth Circuit has not ruled on this issue, the Middle District of North Carolina agrees with the Second Circuit. *See Rich v. KIS California, Inc.,* No. C–87–801–WS, 1988 WL 47605, at *3 (M.D.N.C. Apr. 25, 1988).

**17.** Section 22 of the Securities Act is that statute's section on jurisdiction. *See* 15 U.S.C. § 77v. The jurisdictional reach of

**D. *Corbeil's Motion to Dismiss the Class Action Complaint***

**1. *Personal Jurisdiction***

. Class Plaintiffs allege that defendant Corbeil violated the Securities Act in connection with her signing of the fraudulent 1999 Registration Statement ("the Statement"). *See* CAC ¶¶ 161–69. Specifically, the Class Plaintiffs argue that Corbeil violated Section 11 of the Securities Act, which creates a cause of action against all directors of a company, and everyone who signed a registration statement, if that statement is false or misleading. 15 U.S.C. § 77k(a); *In re Indep. Energy Holdings PLC Sec. Litig.,* 154 F.Supp.2d 741, 753–54 (S.D.N.Y.2001). Also, plaintiffs claim that Corbeil is liable under Section 15 as a "controlling person" of CINAR. *See* 15 U.S.C. § 77o. Corbeil contends that plaintiffs have not alleged facts sufficient to establish minimum contacts for personal jurisdiction. Plaintiffs assert that they have established minimum contacts consistent with the due process clause and also have established an alternative "control person" basis for jurisdiction.

Section 27 of the Exchange Act establishes the basis for personal jurisdiction in securities cases. *Reingold v. Deloitte Haskins & Sells,* 599 F.Supp. 1241, 1250–51 (S.D.N.Y.1984) (citing *Leasco Data Processing Equip. Corp. v. Maxwell,* 468 F.2d 1326, 1340 (2d Cir.1972) (Friendly, J.)); *see* 15 U.S.C. § 78aa.[17] The Restatement

---

Section 22 is viewed as being coextensive with that of Section 27 of the Exchange Act. *Bersch v. Drexel Firestone, Inc.,* 389 F.Supp. 446, 453 (S.D.N.Y.1974), *aff'd in part and rev'd in part on other grounds,* 519 F.2d 974 (2d Cir.1975), *cert. denied,* 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975). Thus, although Corbeil is alleged to have violated only the Securities Act, case law analyzing Section

(Second) of Conflict of Laws elaborates three distinct bases for exercising jurisdiction over a foreign defendant that apply under Section 27. *Leasco,* 468 F.2d at 1341. Jurisdiction is proper if "a foreign defendant ... (1) does business in the forum (Restatement § 35); (2) does an act in the forum (Restatement § 36); or (3) causes an effect in the forum by an act done elsewhere (Restatement § 37)." *Id.* Class Plaintiffs do not contend that Corbeil did business in the United States, or that she committed an act here. Indeed, they do not even allege that she has ever visited the United States. Plaintiffs argue that the 1999 Registration Statement, which Corbeil signed in Canada, caused an effect in the United States.

Section 27's reach extends only as far as the due process clause of the Fifth Amendment allows. *Id.* at 1339–40. Accordingly, the Court may exercise jurisdiction over Corbeil only if she has established minimum contacts with the United States such that the exercise of jurisdiction will "not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Corbeil's contacts with the forum state must be such that she "could reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). In *Leasco,* the Second Circuit highlighted these limitations on the reach of Section 27, noting that, especially in the context of Restatement § 37, courts should guard against applying too low a threshold of foreseeability. *See Leasco,* 468 F.2d at 1341. "The person sought to be charged must know, or have good reason to know, that his conduct will have effects in the state seeking to assert jurisdiction over him." *Id.* The Court also emphasized that "it is essential in each case that there be some act by which the defendant *purposefully avails* itself of the privilege of conducting activities in the forum State ..." *Id.* at 1340 (emphasis added) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)).

Corbeil notes that the only concrete facts that plaintiffs have alleged to establish jurisdiction is that she is the Vice–President and General Counsel of CINAR and that she signed the 1999 Registration Statement. *See* CAC ¶¶ 30, 164. Corbeil maintains that she could not possibly foresee being subject to suit in the United States on the sole basis of signing the Statement. She contends that the only other contacts plaintiffs mention are speculative or conclusory allegations that Corbeil, as CINAR's General Counsel, had substantial contact and interaction with New York-based counsel in preparing the Statement and that she had the power to influence its contents, none of which can be used to establish minimum contacts. *See* Aff. of Peter J. Lerner ¶ 7; CAC ¶¶ 183–84. In response, Class Plaintiffs cite several cases that support the argument that participating in filing false documents is enough to establish minimum contacts. *See Itoba, Ltd. v. LEP Group PLC,* 930 F.Supp. 36 (D.Conn.1996); *Reingold v. Deloitte, Haskins & Sells,* 599 F.Supp. 1241 (S.D.N.Y.1984); *Landry v. Price Waterhouse Chartered Accountants,* 715 F.Supp. 98 (S.D.N.Y.1989); *Derensis v. Coopers & Lybrand Chartered Accountants,* 930 F.Supp. 1003 (D.N.J.1996).

The Court finds that it is perfectly reasonable to exercise jurisdiction over Corbeil based solely on her signing the 1999 Registration Statement. As General Counsel, Corbeil must have known that the Statement was released in connection with a secondary stock offering designed to at-

27 of the Exchange Act governs the jurisdic-

tional inquiry.

tract American investment. There is no clearer example of purposeful availment of the privilege of doing business in the United States than this. In like manner, as General Counsel, Corbeil must have known that the Statement was made to comply with the laws governing securities offerings in American markets and, as such, it would be used and relied upon by American investors. Corbeil could have reasonably foreseen that, were there to be litigation concerning the Statement, she would be haled into court in the United States. Thus, even assuming the heightened foreseeability requirement under Restatement § 37, signing the Registration Statement was enough to put the defendant on notice of potential suit in the United States and shows purposeful availment. Moreover, the cases cited by plaintiff further support this conclusion. Of these, the most analogous is *Itoba.* In that case, a Director and Deputy Chairman of defendant LEP was subject to jurisdiction in the United States for merely approving of the filing of a particular form required by the SEC that later turned out to be fraudulent. *Itoba,* 930 F.Supp. at 41. Indeed, the fact that he did not even attend the board meetings where the documents were approved by the board was immaterial. *Id.* Accordingly, this Court may properly exercise jurisdiction over Corbeil.[18]

### 2. Rule 9(b)—Failure to Plead with Particularity

▉ Corbeil also argues for the first time in her reply brief that Class Plaintiffs' claim under Section 11 of the Securities Act (Count Six) is "based in fraud," and therefore is subject to the strict pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) states, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). Corbeil maintains that the Section 11 claim has not been pled with sufficient particularity. Plaintiffs did not respond to this argument because it was first alleged in the reply brief. Nevertheless, the Class Plaintiffs did respond to a similar argument made by defendant E & Y. *See* Class Pls.' Opp. at 71–73. In that discussion, plaintiffs assert that Rule 9(b) does not apply to Section 11 claims, and that even if it does apply, their Section 11 claim has been adequately pled.

In order to state a claim under Section 11, "only a material misstatement or omission need be shown ... scienter need not be alleged." *Degulis v. LXR Biotech., Inc.,* 928 F.Supp. 1301, 1310 (S.D.N.Y. 1996). Fraud is not an element of the claim and, thus, Rule 9(b) does not generally apply. *Id.* Nevertheless, many district courts in the Second Circuit have held that Rule 9(b) does apply "where the allegations underlying claims under the Securities Act claims are also based in fraud," despite the fact that fraud is not an element of a Section 11 claim. *Geiger v. Solomon–Page Group, Inc.,* 933 F.Supp. 1180, 1189 (S.D.N.Y.1996); *Schoenhaut v. Am. Sensors, Inc.,* 986 F.Supp. 785, 795 (S.D.N.Y.1997). A plaintiff does not need

---

18. Class Plaintiffs' alternative argument that jurisdiction exists because Corbeil is a "controlling person" of CINAR raises an interesting question. There is some support in the case law for the proposition that "control person" status may provide an independent basis for exercising jurisdiction. *See Landry,* 715 F.Supp. at 102; *Derensis,* 930 F.Supp. at 1014; *McNamara v. Bre–X Minerals Ltd.,* 46 F.Supp.2d 628, 636 (E.D.Tex.1999). The Court is wary of this argument, however, because it seems to suggest that by establishing "control person" status, the plaintiff need not satisfy the minimum contacts requirement of due process. *See McNamara,* 46 F.Supp.2d at 636. This would be an odd result to say the least. Nevertheless, as the exercise of jurisdiction is proper by virtue of Corbeil's signing of the 1999 Registration Statement, the Court need not address this issue.

to allege the manner in which a material misstatement on a securities filing was made—innocently, negligently, fraudulently or otherwise—because Section 11 provides for strict liability. *See In re Indep. Energy Holdings*, 154 F.Supp.2d at 754. However, according to the reasoning of these courts, if the plaintiff alleges fraudulent intent, he may then be required to comply with Rule 9(b). *Schoenhaut*, 986 F.Supp. at 795.[19]

Whether Rule 9(b) applies to such claims under Section 11 is a tricky issue. On the one hand, the Court is guided by the language of Rule 9(b) itself suggesting that the rule does apply. *See* Fed.R.Civ.P. 9(b) ("In *all* averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.") (emphasis added). Furthermore, the Court notes that the presence of baseless allegations of fraud in any context risks injuring a defendant's reputation long before he or she has the opportunity to respond. *See In re Livent*, 78 F.Supp.2d at 213. While the Court may easily disregard the allegations of fraud as non-essential to the claim, the concerns that justify the enhanced pleading requirements of Rule 9(b) remain the same. Rule 9(b) serves a valuable deterrent function.

On the other hand, the notion that a complaint could be dismissed for failing to properly allege something that is not even an element of the claim is troubling to say the least. As the Eighth Circuit noted, it "comports neither with Supreme Court precedent nor with the liberal system of 'notice pleading' embodied in the Federal Rules of Civil Procedure." *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 315 (8th Cir.1997). While the Court is persuaded by the Eighth Circuit's position, ultimately it need not address this issue. Even assuming, arguendo, that Rule 9(b) applies, the appropriate remedy for violating it would not be outright dismissal of the Section 11 claim. As the Fifth Circuit stated, "Where averments of fraud are made in a claim in which fraud is not an element ... the proper route is to disregard averments of fraud not meeting Rule 9(b)'s standard and then ask whether a claim has been stated." *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir.2001);[20] *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F.Supp.2d 371, 429–30 (S.D.N.Y.2001) (adopting the same approach). Discarding all allegations that even contain the word "fraudulent," *see* CAC ¶ 165(a)-(e), plaintiffs still have adequately stated a Section 11 claim against Corbeil. By asserting that Corbeil signed the 1999 Registration Statement that later was discovered to be false, and that she was a director and officer of CINAR at the time the statement became effective, *see* CAC ¶¶ 30, 164, plaintiffs have stated a claim under Section 11. *See* 15 U.S.C. § 77k(a).

---

**19.** The Second Circuit has not spoken on this issue, and district courts are split. *Compare Geiger*, 933 F.Supp. at 1189 (supporting the application of Rule 9(b) to Section 11 claims where fraud is alleged); *Schoenhaut*, 986 F.Supp. at 795 & n. 13 (same); *In re N2K Inc. Sec. Litig.*, 82 F.Supp.2d 204, 210 n. 10 (S.D.N.Y.2000) (same) *with In re In–Store Adver. Sec. Litig.*, 878 F.Supp. 645, 650 (S.D.N.Y.1995) (stating Rule 9(b) does not apply to Section 11 claims); *Nelson v. Paramount Communications, Inc.*, 872 F.Supp. 1242, 1246 (S.D.N.Y.1994) (same). *Degulis*

leaves open the possibility of applying Rule 9(b). *See Degulis*, 928 F.Supp. at 1310 ("[Rule 9(b)] has ... been held to apply to claims under Sections 11 and 12(2) only when they sound in fraud.").

**20.** Additionally, the Fifth Circuit noted that if the complaint is deficient after ignoring the allegations of fraud, the judge should dismiss the complaint without prejudice and allow counsel to amend. *Schlotzsky's*, 238 F.3d at 368.

Furthermore, even if Rule 9(b) does apply to Section 11 claims sounding in fraud, Class Plaintiffs' Section 11 claim against Corbeil does not sound in fraud. Citing *Geiger*, Corbeil argues that because the same conduct provides the basis for both the Section 11 claims and the fraud claims under Section 10(b), and underlies the entire Class Action Complaint, the requirements of Rule 9(b) apply to both.[21] The Court is not persuaded by this argument. A Section 11 claim does not sound in fraud simply because it is based on acts that also support a claim for securities fraud under Section 10(b). *See Degulis*, 928 F.Supp. at 1310 ("The fact that subsequent counts in the Complaint allege fraud and certain acts underlie both the Section 11 ... claims and the claims that directly allege fraud does not necessarily mean that the former are based in fraud."). In this case, CINAR's improper recognition of tax credits caused its financial statements to be misleading. These false statements, in turn, provide the basis for both the Section 10(b) claims and the Section 11 claims. Nevertheless, this does not automatically mean that Class Plaintiffs are alleging that all defendants knew of, and were complicit in, this activity. It is true that the Section 11 claim refers to CINAR's "fraudulent tax practices" and "fraudulently obtained" tax credits, as well as its "fraudulent practice" of falsely attributing American scripts to Canadian writers. CAC ¶ 165(a)-(d). Yet these references were included to explain why CINAR's 1997 and 1998 financial statements later turned out to be misleading, a fact that defendants have already conceded. Nowhere does it

claim that Corbeil, herself, was involved in the fraud. Furthermore, the other sections of the Class Action Complaint that catalogue scienter allegations contain no mention of Corbeil, either specifically or by reference. *See* CAC ¶¶ 45–49, 50–55, 108–115. Class Plaintiffs' Section 11 claim against Corbeil therefore more clearly sounds in strict liability, rather than fraud. Accordingly, Class Plaintiffs' Section 11 claim against Corbeil need not comply with Rule 9(b) and has been adequately pled.

*3. Control Person Liability—Section 15 of the Securities Act*

▮ An analysis of control person liability under Section 15 of the Securities Act is similar to the analysis under Section 20(a) of the Exchange Act. *In re Twinlab Corp. Sec. Litig.*, 103 F.Supp.2d 193, 208 (E.D.N.Y.2000). To prove an infraction of Section 20(a), plaintiff must show "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir.1998) (quotation marks and citation omitted).[22] Picking up on the first element of the offense, Corbeil asserts in her reply brief that because Class Plaintiffs have failed to show that she violated Section 11, their claim against her for "control person" liability under Section 15 must necessarily fail, a "primary violation of the securities laws" being a necessary predicate for finding liability under Section 15. *E.g., Griffin v. PaineWebber*

---

**21.** It is important to note that, although the court in *Geiger* did apply Rule 9(b) in this situation, the plaintiff never challenged its application. *See Geiger*, 933 F.Supp. at 1189. Thus, the court did not have occasion to address whether plaintiff did, indeed, have to comply with Rule 9(b) under these circumstances. In the instant case, plaintiffs have

clearly challenged the rule's application. *See* Class Pls.' Opp. at 71–73.

**22.** The term "person" means "a natural person, company, government, or political subdivision, agency, or instrumentality of a government." 15 U.S.C. § 78c(a)(9).

*Inc.,* 84 F.Supp.2d 508, 516 (S.D.N.Y.2000). This argument falls somewhat off the mark. Setting aside the fact that the Court has found that Class Plaintiffs have properly and adequately alleged a Section 11 violation against Corbeil—a conclusion, which, under Corbeil's logic, would dispose of the issue—this finding is not relevant to the Section 15 analysis. To assert a Section 15 claim against Corbeil plaintiffs must allege that CINAR, not Corbeil, committed a Section 11 violation, and that Corbeil "through stock ownership, agency, or otherwise . . . control[ed] any person liable under sections 77k or 77l of this title . . ." 15 U.S.C. § 77o. Plaintiffs have alleged that CINAR committed violations of both Section 11 (15 U.S.C. § 77k(a)) and Section 12(a)(2) (15 U.S.C. § 77l(a)(2)) of the securities laws. CAC ¶¶ 161–169, 170–179. No party in any of the various motions to dismiss has challenged the sufficiency of these allegations. Thus, the Court may proceed to the issue of whether plaintiffs have adequately alleged control on the part of Corbeil. It is unclear from her reply brief whether Corbeil has raised this issue, but assuming that she has, the Court finds that the Class Action Complaint adequately alleges control.

In order to establish that Corbeil was a "controlling person" of CINAR, Class Plaintiffs must show that Corbeil "possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *SEC v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1473 (2d Cir.1996) (quoting 17 C.F.R. § 240.12b–2). It is well accepted that merely alleging that a particular defendant is a director or an officer of a company is not sufficient to allege control. *In re Indep. Energy Holdings,* 154 F.Supp.2d at 772; *Cromer Fin. Ltd. v. Berger,* 137 F.Supp.2d 452, 484 (S.D.N.Y. 2001); *In re Livent,* 78 F.Supp.2d at 221. Plaintiffs have alleged not only that Cor-

beil was a director, Vice–President and General Counsel of CINAR, CAC ¶ 30, but also that she signed the 1999 Registration Statement. CAC ¶ 164. District Courts in this Circuit are split on whether alleging that a defendant signed a fraudulent SEC filing is sufficient to allege control. *In re Livent,* 78 F.Supp.2d at 221 (citing *Jacobs v. Coopers & Lybrand,* No. 97 Civ. 3374, 1999 WL 101772, at *18 (S.D.N.Y. Mar. 1, 1999) (collecting cases)). As was the *In re Livent* court, this Court is persuaded by the reasoning of *Jacobs:* "[i]t does comport with common sense to presume that a person who signs [her] name to a report has some measure of control over those who write the report." *Jacobs,* 1999 WL 101772, at *17 (quoted in *In re Livent,* 78 F.Supp.2d at 221–22); *see also In re Indep. Energy Holdings,* 154 F.Supp.2d at 772 (allegations that defendants were directors, held substantial equity in the company, and had signed the filing in question were enough to show control); *In re Twinlab,* 103 F.Supp.2d at 208–09 (same); *In re Quintel Entm't Inc. Sec. Litig.,* 72 F.Supp.2d 283, 298 (S.D.N.Y.1999) (showing "access to [the company's] internal reports, press releases, public filings, and [that defendant] had the ability to prevent the issuance or correct the statements" adequately alleges control). Accordingly, plaintiffs have adequately alleged control on the part of Corbeil.

There is also considerable disagreement over whether plaintiffs need to allege that "the controlling person was in some meaningful sense a culpable participant in the primary violation," as required under Section 20(a), in order to state a claim under Section 15. The dispute is especially pertinent in this case because it is clear that Class Plaintiffs have not made any specific allegations that Corbeil was involved in the improper conduct except to say that she was CINAR's General Counsel and that she signed the 1999 Registration State-

ment. Without more evidence it would be difficult for plaintiffs to successfully allege culpable participation, which requires "a showing of both fraudulent conduct and a culpable state of mind." *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058, 2001 WL 1111508, at *10 (S.D.N.Y. Sept. 20, 2001). Accordingly, the viability of plaintiffs' Section 15 claim turns on whether this element applies to these claims at all. Again, district courts in this circuit are divided. *Compare P. Stolz Family P'ship, L.P. v. Daum*, 166 F.Supp.2d 871, 873 (S.D.N.Y.2001) (requiring a showing of culpable participation); *Demaria v. Andersen*, 153 F.Supp.2d 300, 314 (S.D.N.Y.2001) (same); *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F.Supp.2d 424, 441 (S.D.N.Y.2000) (same) *with In re Indep. Energy Holdings*, 154 F.Supp.2d at 770 (no allegations of culpable participation required); *In re Twinlab*, 103 F.Supp.2d at 207–08 (same). Those courts that have required allegations of culpable participation have done so as a matter of course with little or no discussion about whether it is indeed an element of a claim under Section 15. *See Demaria*, 153 F.Supp.2d at 314; *In re Am. Bank Note Holographics*, 93 F.Supp.2d at 441. Those courts that have not required allegations of culpable participation have reasoned that because claims under Section 11 and Section 12(a)(2) of the Securities Act do not contain an intent element—indeed, defendants need not even know about the misrepresentations—it would make little sense to compel plaintiffs to allege a culpable state of mind in order to state a claim under Section 15. *See In re Indep. Energy Holdings*, 154 F.Supp.2d at 770; *In re Twinlab*, 103 F.Supp.2d at 208. The Court finds this reasoning persuasive and declines to require plaintiffs to allege culpable participation. Having adequately alleged a primary violation by CINAR and Corbeil's control over CINAR, Class Plain-

tiffs' Section 15 claim against Corbeil survives.

### E. E & Y's Motion to Dismiss the Class Action Complaint

#### 1. Rule 9(b)—Failure to Plead with Particularity

■ E & Y's Rule 9(b) motion is similar to that of Corbeil. E & Y adds only one additional wrinkle. E & Y correctly notes that the Class Action Complaint makes reference to the fraudulent tax credit scheme in several places. *See* CAC ¶¶ 76, 89(a). E & Y then claims that these allegations were incorporated into the Section 11 claim against E & Y by paragraph 161 of the Class Action Complaint, which states, "[p]laintiffs repeat and reallege each and every preceding allegation." CAC ¶ 161. As a result, E & Y maintains that Class Plaintiffs have accused E & Y of acting with fraudulent intent. This argument is unpersuasive. The Class Action Complaint never alleges fraud against E & Y specifically. Merely stating boilerplate language of the sort found in paragraph 161 does not transform their earlier discussion of fraudulent activity into an assertion of fraud against E & Y. *See Degulis*, 928 F.Supp. at 1310 ("The fact that subsequent counts in the Complaint allege fraud and certain acts underlie both the Section 11 ... claims and the claims that directly allege fraud does not necessarily mean that the former are based in fraud."). Moreover, as previously discussed with respect to Corbeil's Rule 9(b) motion, setting aside the allegations that contain the word "fraudulent," Class Plaintiffs have still alleged adequate facts to sustain a Section 11 claim against E & Y. By asserting that the 1999 Registration Statement contained "untrue statements of material fact" when it became effective, CAC ¶ 163, and that E & Y audit opinions appeared with its consent in the Statement, CAC ¶ 165, Class

Plaintiffs have stated a claim under Section 11. *See* 15 U.S.C. § 77k(a).

### F. CINAR's Motion to Dismiss the Carson Complaint

#### 1. Failure to State a Claim under the North Carolina Unfair Trade Practices Act

In addition to their securities fraud and common law fraud claims, Carson Plaintiffs allege in the alternative a violation of the North Carolina Unfair Trade Practices Act ("NCUTPA"). In order to state a claim under NCUTPA, "a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp,* 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). The statute defines "commerce" as encompassing "all business activities, however denominated ... [but not] includ[ing] professional services rendered by a member of a learned profession." N.C. Gen.Stat. § 75–1.1(b) (cited in *HAJMM Co. v. House of Raeford Farms, Inc.,* 328 N.C. 578, 592–93, 403 S.E.2d 483, 492 (1991)). Despite the potential for broad application of this statute, North Carolina courts have cabined its protection even further than the "professional services" limitation. Stressing that NCUTPA was not "intended to apply to all wrongs in a business setting," these courts have held that securities transactions and typical employer-employee disputes, *inter alia,* do not come within the scope of NCUTPA's definition of "business activity," and are thus not covered by the statute. *See Dalton,* 353 N.C. at 656–57, 548 S.E.2d 704; *HAJMM,* 328 N.C. at 592–93, 403 S.E.2d 483; *see also Skinner v. E.F.Hutton & Co.,* 314 N.C. 267, 274–75, 333 S.E.2d 236, 241 (1985) (securities fraud not covered); *Buie v. Daniel Int'l Corp.,* 56 N.C.App. 445, 447–48, 289 S.E.2d 118, 119–20 (1982)

(employment disputes not covered). North Carolina courts reason that the legislature did not intend to extend the statute's protection to areas that were already covered by comprehensive regulatory schemes. *See Skinner,* 314 N.C. at 275, 333 S.E.2d 236 (noting that securities transactions were already subject to federal and state securities laws); *Buie,* 56 N.C.App. at 448, 289 S.E.2d 118 (stating "[e]mployment practices fall within the purview of other statutes adopted for that express purpose.").

Carson Plaintiffs are correct to point out that this is neither solely a securities case, nor solely an employment case, though it contains elements of both. Certainly it is true that part of CINAR's payment for Carson–Dellosa was in the form of securities. It is also true that plaintiffs entered into employment contracts containing noncompete agreements in association with the sale. Yet the claim cannot be dissected into its component parts and dismissed piecemeal. This case involves one large transaction relating to the purchase of a business. The Court is sympathetic to the argument that, in this case, the whole is greater than the sum of the parts. As a result, plaintiffs' claim, prior to 1991 at least, would have survived.

The Court finds it impossible, however, to ignore the language contained in the *HAJMM* case decided in that year. In *HAJMM,* the North Carolina Supreme Court had occasion to evaluate the purpose and scope of NCUTPA and to explain the reasons underlying its prior decision in *Skinner* not to extend NCUTPA to securities transactions *See HAJMM,* 328 N.C. at 592–95, 403 S.E.2d 483. After reiterating its point that securities transactions are already covered by a comprehensive regulatory scheme, thereby rendering an additional claim under NCUTPA needlessly duplicative, the court offered an additional

limiting principle based on the language of the statute itself. *See id.* at 594, 403 S.E.2d 483. The court stated, "Subsection (b) of this section of the Act defines the term 'commerce' to mean 'business activities.' 'Business activities' is a term which connotes the manner in which businesses conduct their *regular, day-to-day activities, or affairs,* such as the purchase and sale of goods, or *whatever other activities the business regularly engages in and for which it is organized.*" *Id.* (emphasis added). The court considered the issuance and redemption of securities "an extraordinary event" that may help create a going concern, or enable one to continue engaging in its business activities, but does not, itself, qualify as a "business activity" under NCUTPA. *Id.*

The above-quoted language was intended by the North Carolina Supreme Court to be an interpretation of the statutory language of NCUTPA, further restricting its coverage, to be applied to all claims brought under it. While it is true that the impact of this language could, in theory, be limited solely to the context of securities transactions, the Court cannot logically draw that conclusion. First, if the North Carlina Supreme Court were merely endeavoring to reiterate its previous ban on NCUTPA claims in securities cases, it would serve them little to articulate yet another reason for a prohibition that was already well settled. Second, and more importantly, the Court's opinion does not focus on the context of the case, but rather the language of the statute itself. As such, the opinion turns not on the nature of securities transactions, but instead on the meaning of the phrase "business activity." Any interpretation of this language must necessarily apply to all claims under NCUTPA.

The Court is further convinced that this language represents a departure from past interpretations of NCUTPA by the fact that it elicited a strongly-worded dissent on this very point, *see id.* at 595–97, 403 S.E.2d 483, and that subsequent North Carolina cases have picked up the majority's language in evaluating NCUTPA claims. *See Davis Lake Cmty. Ass'n, Inc. v. Feldmann,* 138 N.C.App. 292, 296, 530 S.E.2d 865, 869 (2000); *Malone v. Topsail Area Jaycees, Inc.,* 113 N.C.App. 498, 501–02, 439 S.E.2d 192, 194 (1994). The Court is mindful of the reticence expressed by some courts to further restrict an act that the North Carolina Supreme Court has itself, in the past, refused to limit. *See Food Lion, Inc. v. Capital Cities/ABC, Inc.,* 951 F.Supp. 1224, 1231–32 (M.D.N.C. 1996) (noting that in *United Labs., Inc. v. Kuykendall,* 322 N.C. 643, 370 S.E.2d 375 (1988), the North Carolina Supreme Court refused to limit NCUTPA's coverage of businesses to areas involving fraudulent advertising or buyer-seller relationships). Nevertheless, the Court must heed what it views to be a clear directive from the state's highest court.

Having concluded that *HAJMM*'s interpretation of "business activity" applies to this case, the Court finds that the purchase of a business is not a "regular, day-to-day activity or affair" in the life of a going concern. It goes without saying that CINAR was not "organized for the purpose of" purchasing other companies. Indeed, much as the issuance of securities is an activity necessary to create or sustain a going concern, the purchase of another company is an activity necessary to enlarge a going concern; neither is a day-to-day activity for which the going concern was organized. As such, this Court finds that CINAR's purchase of Carson–Dellosa was an "extraordinary event" of the sort that does not come under the definition of "business activity" as construed in *HAJMM.* Accordingly, Carson Plaintiffs' claim under NCUTPA is untenable.

## G. Weinberg and Charest's Motion to Dismiss the Carson Complaint

### 1. Failure to State a Claim of Fraud

 Weinberg and Charest argue that the Carson Plaintiffs have failed to state a claim of fraud, thus eliminating Counts One through Five and Counts Seven through Eight of the *Carson* Complaint, leaving only a claim for breach of contract against CINAR (Count Six). The argument is substantially similar to the one made in their motion to dismiss the *Kelley* Complaint.[23] Defendants make only one additional point. They argue that the merger clause contained in the Carson SPA supersedes all prior oral representations and therefore the plaintiffs could not have reasonably relied on the prior statements that form the basis for their claim of fraud. Plaintiffs counter that a general merger clause, such as the one in the Carson SPA, is insufficient to bar a cause of action for fraud. Rather, the merger clause must contain specific disclaimers of reliance in order to preclude a claim of fraud.

Under New York law[24] a plaintiff must specifically disclaim reliance on a particular oral representation in order to preclude a claim of fraud in the inducement based on that representation; a general merger clause alone is insufficient. *Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 316 (2d Cir.1993); *Hobart v. Schuler*, 55 N.Y.2d 1023, 1024, 449 N.Y.S.2d 479, 480, 434 N.E.2d 715, 716 (1982).[25] The merger clause in the Carson SPA appears to be a general merger clause of this sort.[26] Defendants make a creative attempt to circumvent the general merger clause doctrine. They assert that reiterating the specific language of the previous oral representations in the Carson SPA, combined with the general language of the merger clause, has the same effect as a specific disclaimer and thus negates the prior fraudulent inducement. The Court is not convinced. The Carson Plaintiffs did not specifically disclaim any reliance on CINAR's financial statements and SEC filings in the Carson SPA; indeed, those representations were the reason the Carson Plaintiffs entered into the contract in the first place. Faced with only a general merger clause, it would be counterintuitive, indeed ridiculous, for this Court to rule that a fraud claim evaporates, leaving only a breach of contract claim, merely because the *same fraudulent statements*

---

23. *See* discussion *supra* Section C.1.

24. The parties dispute whether New York or North Carolina law apply to this claim. Each maintains, however, that the outcome favors their side regardless of which law the Court applies. As the Court finds that the law defendants favor, New York law, does not support their claim, the Court applies New York law, thereby rendering moot any conflict of law question.

25. The cases defendants cite are not to the contrary. *See Harsco Corp. v. Segui*, 91 F.3d 337 (2d Cir.1996) (applying the rule of *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959) requiring specific disclaimers of reliance to bar a fraud suit); *Western Intermodal Servs., Ltd. v. Singamas Container Indus. Co.*, No. 98 Civ. 8275, 2000 WL 343780, at *3 nn. 2–3 (S.D.N.Y. March 31, 2000) (same). Defendants also cite *Chavin v. McKelvey*, 182 F.3d 898 (2d Cir.1999). It is not clear that *Chavin* casts doubt upon the general merger clause rule. Even if it does, this case is unpublished and, as plaintiffs correctly point out, must not be cited as controlling authority according to the rules of the Second Circuit. *See* Local Rules of the Second Circuit § 0.23.

26. It states: "This agreement constitutes the full and entire understanding and agreement between the Parties with regard to the subjects hereof and thereof and this Agreement replaces and supersedes all prior agreements and understandings between the Parties with respect to such subject matter." Carson Am. Compl., Ex. 1 ¶ 11.3.

that induced the contract now appear in it. Accordingly, the Court declines to do so.

The inquiry does not end here, however. "Even if an integration clause is general, a fraud claim will not stand where the clause was included in a multi-million dollar transaction that was executed following negotiations between sophisticated business parties and a fraud defense is inconsistent with other specific recitals in the contract." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 165 F.Supp.2d 615, 622 (S.D.N.Y.2001) (citing *Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 95, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985)). Thus, in addition to the language of the integration clause, the Court must also consider "the entire contract, and the sophistication and knowledge of the parties." *Id.* at 622–23. In the instant case, the agreement was indeed in the millions of dollars, and the plaintiffs were arguably sophisticated business people negotiating at arms length—a point that the defendants highlight. Nevertheless, no amount of sophistication or due diligence could have helped the Carson Plaintiffs discover CINAR's fraud. Plaintiffs had no means by which to reveal "the real quality of the subject of the representation." *Id.* at 623 (citing *Schlaifer Nance & Co., Inc. v. Estate of Andy Warhol*, 119 F.3d 91, 98 (2d Cir.1997)). Accordingly, these arguments ring hollow.

## H. Panju's Motion to Dismiss the Carson Complaint

### 1. Rule 9(b)—Failure to Plead with Particularity

The Carson Plaintiffs claim that defendant Panju violated Section 10(b) of the Exchange Act and Rule 10b–5. Carson Am. Compl. ¶¶ 74–82. In order to state a claim under Section 10(b) and Rule 10b–5, plaintiffs must allege that the defendant, "(1) made misstatements or omissions of material fact; (2) with scienter;

(3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *In re Livent*, 78 F.Supp.2d at 213 (quoting *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 106 (2d Cir.1998)). Thus, unlike stating a claim under Section 11 of the Securities Act, which contains no intent element, Section 10(b) requires plaintiffs to allege that defendants acted with "an intent to deceive, manipulate, or defraud." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001) (internal quotation marks omitted) (quoting *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168 (2d Cir.2000)). Panju argues that these elements, especially the scienter and materiality requirements, have not been pled with sufficient particularity under Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA").

With the passage of the PSLRA in 1995, pleading requirements for securities fraud cases were made more demanding. *See Novak v. Kasaks*, 216 F.3d 300, 305–07 (2d Cir.2000). While Rule 9(b) continues to apply, requiring that when a complaint alleges fraud, "the circumstances constituting fraud ... shall be stated with particularity," Fed.R.Civ.P. 9(b), the more exacting requirements of the PSLRA govern an inquiry into the adequacy of such pleadings. *See id.* The pertinent sections of the PSLRA state as follows:

(b) Requirements for securities fraud actions

 (1) Misleading statements and omissions

 In any private action arising under this chapter in which the plaintiff alleges that the defendant -

 (A) made an untrue statement of a material fact; or

 (B) omitted to state a material fact necessary in order to make the statements made, in the light of the

circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) Required state of mind

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b).[27] The Second Circuit recently clarified that except for the addition of the words "with particularity," the PSLRA adopted the Second Circuit's existing pleading standard for scienter under Rule 9(b). *See Novak*, 216 F.3d at 311; *Kalnit*, 264 F.3d at 138–39. Plaintiffs must allege facts that "give rise to a strong inference of fraudulent intent." *Novak*, 216 F.3d at 307 (citing *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995)). Plaintiffs may do so either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994); *Kalnit*, 264 F.3d at 138–39. While each case is fact-depen-

dent, the Second Circuit in *Novak* offered some guidance in interpreting the scienter requirement, describing four general categories of cases that might give rise to a "strong inference" of fraudulent intent if the facts are sufficiently pled in the complaint. *See Novak*, 216 F.3d at 311. Plaintiffs may assert that defendants "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Id.* (internal citations omitted). Carson Plaintiffs claim that they have alleged facts that satisfy both the "motive and opportunity" prong and the "conscious misbehavior or recklessness" prong, and that the instant case falls within all four general categories giving rise to a "strong inference" of scienter. While plaintiffs may overstate their case, they do allege facts sufficient to state a case under a "conscious misbehavior or recklessness" theory.[28]

To allege the requisite recklessness under the "conscious misbehavior or recklessness" prong, plaintiffs must demonstrate that defendants' conduct was "highly unreasonable and ... represent[ed] an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Novak*, 216 F.3d at 308 (quoting *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 47 (2d Cir.1978)); *Kalnit*, 264 F.3d at 142 (quoting *Honeyman v. Hoyt (In re Carter–Wallace, Inc. Sec. Litig.)*, 220 F.3d 36, 39 (2d Cir.2000)). For secu-

**27.** As is evident, § 78u–4(b)(1) explains the pleading requirements necessary to properly allege the "material misstatement" element of a 10(b) claim, and § 78u–4(b)(2) does the same for the "scienter" element.

**28.** As the "conscious misbehavior or recklessness" inquiry is dispositive of the issue, the Court declines to engage in an analysis of "motive and opportunity."

rities fraud claims, plaintiffs can meet this standard, as a general matter, by alleging that plaintiffs "had knowledge of facts or access to information contradicting their public statements" such that they "knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak,* 216 F.3d at 308; *Kalnit,* 264 F.3d at 142; *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 76 (2d Cir.2001). It goes without saying that knowingly misstating information pertaining to CINAR's financial health on a public filing would run afoul of this standard. The question remains, however, whether Panju knew the statements were false and thereby acted with fraudulent intent, or was an innocent bystander to the misdeeds of his co-directors.

Plaintiffs contend that Panju did know about the illegal tax credit scheme and knew about CINAR's improper related party transactions at the time he made representations concerning the financial health of the Company during negotiations with the Carson plaintiffs and at the time of the execution of the Carson SPA. Carson Am. Compl. ¶¶ 19, 41.[29] Of course, mere speculation or conclusory allegations that Panju knew about the fraud do not satisfy the pleading requirements. *Ganino,* 228 F.3d at 169. Plaintiffs must plead sufficient *facts* with particularity that would give rise to a strong inference of scienter. *See* 15 U.S.C. § 78u–4(b)(2).

Carson Plaintiffs have, indeed, alleged adequate facts. First, plaintiffs claim that according to court papers already filed by the RCMP in Quebec, a former Canadian CINAR scriptwriter, Thomas LaPierre, admitted that he allowed his name to be placed on American-authored scripts. Carson Am. Compl. ¶ 54. He further stated that Panju, along with others "asked him to draw up subcontracts for paying the United States authors." *Id.* It is certainly true that simply buying the work of American authors does not violate the tax law as long as CINAR did not attempt to claim a tax credit for it. Nevertheless, Panju's association with someone now known to be involved in the tax fraud does trigger well founded suspicion. LaPierre played an instrumental role in the commission of the fraud by lending his name to many of the falsely attributed scripts. It is this same man whom Panju chose to draft contracts with American authors. It would not be too great an inferential leap to conclude that these contracts produced some of the very scripts that falsely identified LaPierre as the author and that this was the reason Panju entrusted LaPierre with this job.

Panju's position as CFO of CINAR, when considered together with the restatement of the 1997 financial statements, provides further evidence. Plaintiffs note that in their March 10, 2000 press release, CINAR admitted that the 1997 statements would have to be revised due to "improper tax incentives and the disclosure of related party transactions." *Id.* ¶ 63. Panju was therefore serving as CFO when tax credits were improperly taken. *Id.* ¶ 9. In cases involving revisions of financial statements such as this, courts in the Second Circuit have held that "subsequent admissions of misrepresentations, coupled with the defendants' continuous intimate knowledge of company affairs" is enough to adequately infer scienter on the part of those individual defendants. *Stevelman v. Alias Re-*

**29.** Thus, plaintiffs are not asserting "fraud by hindsight," as Panju claims. They are not inferring that Panju *must have* knowingly misstated the financial health of CINAR at the time of his favorable predictions given that these predictions turned out to be false later. Plaintiffs are stating categorically that he *did* knowingly misrepresent the truth at the time he made the statements.

*search Inc.*, 174 F.3d 79, 84–85 (2d Cir. 1999) (citing *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 573 (2d Cir.1982)). In *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F.Supp.2d 424, 446–47 (S.D.N.Y.2000), a case factually similar to this one, the defendant corporation was forced to restate financial statements issued over the course of a three year period from 1996–1998. *Id.* at 432–33. The corporation admitted that the revisions were the result of improper revenue recognition. *Id.* In holding that plaintiffs had properly alleged conscious misbehavior or recklessness on the part of both the CEO and CFO, the court stated:

> [T]he admitted falsity of the statements, the extraordinary degree to which they were false, the length of time (covering several years) that the statements were false, and [the CEO's and CFO's] access to Holographics actual sales and revenue information by virtue of their positions within the company, combine to raise a strong inference that [the two] engaged in conduct that was either conscious or reckless.

*Id.* at 447. The Court is faced with a similar situation here. As CFO, Panju was certainly familiar with all financial aspects of CINAR, including its tax liability. It would be possible to imagine a scenario where Panju, despite being CFO, was oblivious to the tax fraud scheme, the nefarious acts being entirely the work of Weinberg or Charest or someone else. Yet given plaintiffs' other evidence, this already unlikely scenario becomes that much more doubtful. Viewing all of these facts in the light most favorable to plaintiffs, the Court finds that the Carson Plaintiffs have adequately pled scienter under the PSLRA.[30]

■■■ Having established a "strong inference" of scienter, the Carson Plaintiffs still must satisfy the "material misstatement" element by specifying which of Panju's statements were misleading and why. 15 U.S.C. § 78u–4(b)(1). Specifically, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Stevelman*, 174 F.3d at 84 (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)). Panju is correct to focus the Court's attention only on those statements made before the Carson SPA was executed in 1997 because, logically, the Carson Plaintiffs could not have justifiably relied on any statements made afterwards. Nevertheless, plaintiffs have specified pre-Carson SPA statements made by, or attributable to Panju that are misleading.

Beginning with the written statements, the Carson Plaintiffs identify several financial statements that Panju offered as proof of CINAR's strong financial position.[31] Although plaintiffs do not allege that the

---

**30.** The Carson Plaintiffs also allege that after the 1999 press release disclosed the existence of the tax investigations, Panju, along with Weinberg, traveled to North Carolina to speak with plaintiffs and their employees in an attempt to mitigate the damage. *Id.* ¶ 50. At that meeting, Panju stated that "the tax fraud allegations were 'no big deal,' that they related to productions that had been created a long time ago, and that CINAR was being used as a 'political football.'" *Id.* These statements are admittedly less suspicious because they do not specifically suggest that Panju knew about the fraud at all, much less that he knew of it at the time of his represen-

tations to the Carson Plaintiffs. These statements could be construed as an earnest attempt to control the damage by someone who knew nothing about their underlying falsity. Nevertheless, when viewed alongside the other evidence of scienter, these statements look questionable and therefore add to the inference.

**31.** These include the CINAR Annual Reports for 1994, 1995 and 1996; Management Proxy Circulars for 1995, 1996 and 1997; and the 1997 Interim Report for the First Quarter ending February 28, 1997. Carson Am. Compl. ¶ 21.

written statements were made by Panju himself, they contend that the "group pleading" doctrine adopted by the Second Circuit allows plaintiffs to circumvent the general pleading rule that fraudulent statements must be linked directly to the party accused of fraudulent intent. *See DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987); *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir.1986). According to the "group pleading" doctrine, "[i]n cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group published information', it is reasonable to assume that these are the collective actions of the officers." *In re Health Mgmt., Inc. Sec. Litig.*, 970 F.Supp. 192, 208 (E.D.N.Y.1997) (quoting *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1440 (9th Cir.1987)). To satisfy Rule 9(b), plaintiffs simply need to identify the misleading statements with particularity and specify "the roles of the individual defendants in the misrepresentations." *Id.* Although the "group pleading" doctrine was adopted before the PSLRA was enacted, district courts in the Second Circuit have concluded that the PSLRA does not affect it. *See In re Ox-*

*ford Health Plans, Inc.*, 187 F.R.D. 133, 142 (S.D.N.Y.1999); *In re Health Mgmt.*, 970 F.Supp. at 208–09.

Carson Plaintiffs have adequately specified which statements were misleading and when and where they were issued. *See* Carson Am. Compl. ¶¶ 21–25. They have alleged that Panju was on the Board of Directors and a member of the Senior Management when most of these statements were drafted, and that he later became CINAR's Vice–President of Finance in 1995 and then its CFO in 1996. *Id.* ¶ 9. Even if some of the earlier statements do not fall within this period, most of the later statements relied upon by the Carson Plaintiffs were composed during Panju's tenure as an officer of CINAR, and therefore can be attributed to him under the "group pleading" doctrine.[32] Finally, plaintiffs have easily demonstrated why the statements were fraudulent. CINAR, itself, admitted in their March 10, 2000 press release that their 1997 financial reports contained untrue statements concerning the financial health of the Company and needed to be revised. *Id.* ¶ 69. Accordingly, the written statements satisfy Rule 9(b) and the PSLRA pursuant to the "group pleading" doctrine.[33] As Panju

---

**32.** The cases defendant cites to the contrary are not compelling. While *Polar Int'l Brokerage Corp. v. Reeve*, 108 F.Supp.2d 225 (S.D.N.Y.2000) does recognize that the "group pleading" doctrine is a very limited exception to the pleading requirements, applying only to true corporate insiders and not those merely affiliated with the company, *see id.* at 237, Panju is clearly one such insider. *See Burke v. Dowling*, 944 F.Supp. 1036, 1063 (E.D.N.Y.1995) (defendants who were both officers and directors of the defendant corporations were covered by the group pleading doctrine).

**33.** Panju's oral statements made during the Carson SPA negotiations are not clearly misleading. Carson Plaintiffs allege that Panju told them that "they would be better off accepting CINAR stock rather than cash, in

exchange for Carson–Dellosa stock," and that "based on the facts known to [him], [he] expected CINAR's stock to increase in value over the next two or three years." Carson Am. Compl. ¶ 20. Panju tries to dismiss these statements as innocent "puffery," as opposed to fraud, and cites several cases where representations of this sort were insufficient to satisfy the pleading requirements. Certainly puffery is not actionable. *See, e.g., Novak*, 216 F.3d at 315; *Freedman v. Value Health, Inc.*, 135 F.Supp.2d 317, 343 (D.Conn.2001). On the other hand, puffery is innocuous only if "the company's disclosures [are not] inconsistent with current data," that is, that the company has some legitimate reason to be optimistic. *Shields*, 25 F.3d at 1129. Plaintiffs are alleging Panju knew for a fact that CINAR was involved in fraud and knew that the apparent financial health of CINAR was a

does not contest the rest of the elements of the 10(b) claim, his motion to dismiss for failure to plead fraud with particularity is denied.

### 2. Control Person Liability—Section 20(a) of the Exchange Act

 Panju argues that the Carson Plaintiffs have not alleged sufficient facts to support their claim that Panju was a controlling person of CINAR under Section 20(a) of the Exchange Act. As previously discussed, to state a claim under Section 20(a), plaintiffs must show "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." *Boguslavsky,* 159 F.3d at 720 (quotation marks and citation omitted). In order to establish control over a primary violator, plaintiffs must show that "the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *First Jersey Securities,* 101 F.3d at 1473 (quoting 17 C.F.R. § 240.12b–2). Actual control over the primary violator and the transactions in question is necessary for control person liability. *Cromer,* 137 F.Supp.2d at 484; *In re Indep. Energy Holdings,* 154 F.Supp.2d at 770; *In re Livent,* 78 F.Supp.2d at 221. Accordingly, merely alleging that the defendant was a director or officer of the primary violator corporation is not enough. *Cromer,* 137 F.Supp.2d at 484; *In re Livent,* 78 F.Supp.2d at 221. For plaintiff's claim to survive a motion to dismiss, "[the] plaintiff need only plead facts supporting a reasonable inference of control." *Gabriel*

*Capital, L.P. v. NatWest Finance, Inc.,* 122 F.Supp.2d 407, 426–27 (S.D.N.Y.2000); *In re Indep. Energy Holdings,* 154 F.Supp.2d at 770; *Steed Fin.,* 2001 WL 1111508, at *10.

Panju seizes upon the "actual control" requirement and attempts to argue that plaintiffs allegations that he was *"in a position* to control CINAR's actions" in the Carson SPA negotiations, and that he "had a leading role" in that transaction, do not rise to the level of *"actual* control." Reply Mem. of Law in Supp. of Def. Panju's Mot. to Dismiss at 11. Yet this argument raises semantics over substance. Had plaintiffs stated that Panju "controlled CINAR's actions," Panju no doubt would have assailed such a statement as a conclusory allegation insufficient to satisfy the pleading requirements. That plaintiffs decided instead to hedge their assertion only slightly does not vitiate the significance of their allegations. Plaintiffs have alleged that Panju was a director of CINAR, its CFO and Vice–President of Finance at the time the fraudulent financial statements were made and thus had control over its financial documents. Carson Am. Compl. ¶ 9. Those facts, in connection with the assertion that Panju was one of a few people who directed the Carson SPA transaction, are more than enough to properly allege actual control over the primary violator. *See In re Quintel Entm't,* 72 F.Supp.2d at 298 (finding control existed where corporate executives had access to internal documents and public filings, and had the ability to prevent their issuance and to correct their statements). This is especially true given the permissive pleading standard at the motion to dismiss stage. *See Gabriel Capital,* 122 F.Supp.2d

---

sham. Seen in this context, his statement that the value of CINAR's stock was likely to increase was a false statement of existing fact of the sort sufficient to satisfy the pleading requirements. *See Novak,* 216 F.3d at 315.

The stock could only decrease in value. The Court need not resolve this, however, as the written statements attributable to Panju are enough to satisfy the "material misstatement" requirement of the PSLRA.

320

at 426–27 ("[the] plaintiff need only plead facts supporting a reasonable inference of control."). Moreover, the cases Panju cites in support of his argument do nothing to contradict this position. Both *In re Blech Sec. Litig.*, 961 F.Supp. 569 (S.D.N.Y.1997) and *Ross v. Bolton,* No. 83 Civ. 8244, 1989 WL 80428 (S.D.N.Y. Apr. 4, 1989), *order vacated in part on other grounds,* 1989 WL 80425 (S.D.N.Y. Apr. 10, 1989), involved outside parties who merely "influenced" or "affected" the primary violator. *See In re Blech,* 961 F.Supp. at 586–87; *Ross,* 1989 WL 80428, at *3–4. Plaintiffs have alleged much more "actual control" than existed in those cases.

With respect to the third element, Panju contends that because this element is subject to the strict pleading requirements of the PSLRA, plaintiffs have failed to meet their burden. Panju is correct that the "culpable participation" requirement is governed by the PSLRA. *In re Indep. Energy Holdings,* 154 F.Supp.2d at 771 ("Because the culpable participation element requires plaintiffs to prove the controlling person's state of mind, the PSLRA's heightened pleading requirements apply"); *Gabriel Capital,* 122 F.Supp.2d at 427 (same). Accordingly, plaintiffs must "state with particularity facts giving rise to a strong inference that [Panju] ... culpably participated in [CINAR's] primary violation." *Id.* A proper allegation of "conscious misbehavior or recklessness" satisfies this requirement. *In re Indep. Energy Holdings,* 154 F.Supp.2d at 771. As the Court has already determined that plaintiffs have alleged scienter under section 10(b), they have also done so under section 20(a). Accordingly, Panju's motion is denied.[34]

*3. Failure to State a Claim of Fraud*

With respect to this cause of action, Panju raises the same arguments as Weinberg and Charest in their motions to dismiss the *Kelley* Complaint and the *Carson* Complaint. For the same reasons articulated in Sections C.1 and G.1, *supra,* the motion fails.

*4. Failure to State a Claim Under NCUTPA*

With respect to this cause of action, Panju raises the same points as CINAR in its motion to dismiss the *Carson* Complaint. Panju does take a slightly more forceful stance, arguing that NCUTPA violations may not exist along side what is, at the core, a securities violation. The Court need not address this, however. For the same reasons articulated in Section F.1, *supra,* the motion is granted.

*5. Failure to State a Claim of Negligent Misrepresentation*

■ In order to state a claim for common law negligent misrepresentation under North Carolina law, the Carson Plaintiffs must show that Panju supplied information to guide them in their business transaction, that he failed to exercise the care and competence in obtaining and communicating the information that they were justified in expecting, and that they suffered harm because of their reliance upon the information in executing the Carson SPA. *See Davidson & Jones, Inc. v. County of New Hanover,* 41 N.C.App. 661, 669, 255 S.E.2d 580, 585 (1979). Panju asserts that the Carson Plaintiffs' claim of negligent misrepresentation relies on the same facts as their 10(b) claim and therefore has not been alleged with sufficient particularity ac-

**34.** Panju originally challenged the first element of the offense in his initial brief, but made no mention of it in his reply brief. The Court declines to address this argument because it is clear that plaintiff adequately alleged a primary violation by CINAR.

cording to Rule 9(b). It may indeed be correct that Rule 9(b) applies to negligent misrepresentation claims sounding in fraud, *see In re Leslie Fay Companies, Inc. Sec. Litig.*, 918 F.Supp. 749, 766–67 (S.D.N.Y.1996); *Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 199 (M.D.N.C.1997), although, like Section 11 claims, negligent misrepresentation is a cause of action for which fraudulent intent is not an element. *See Davidson & Jones*, 41 N.C.App. at 669, 255 S.E.2d 580. Accordingly, the Court harbors doubts as to the application of Rule 9(b) to these claims similar to those already expressed with respect to the application of Rule 9(b) to Section 11 claims. *See* discussion *supra* Section D.2; *see also In re LILCO Sec. Litig.*, 625 F.Supp. 1500, 1504 (E.D.N.Y.1986) (stating that Rule 9(b) does not apply to claims of negligent misrepresentation). Even so, as explained in Section H.1, *supra*, the Carson Plaintiffs have met their burden under Rule 9(b) and the PSLRA. Accordingly, the motion is denied.

### 6. North Carolina Securities Act ("NCSA")

■ Carson Plaintiffs claim that in misrepresenting CINAR's financial health, Panju violated Section 78A–8 of the North Carolina Securities Act. Carson Am. Compl. ¶ 94. Section 78A–8 provides that:

It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:

(1) To employ any device, scheme, or artifice to defraud,

(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading or,

(3) To engage in any act, practice, or course of business which operates or

would operate as a fraud or deceit upon any person.

N.C. Gen.Stat. § 78A–8. Panju contends that plaintiffs' claim under the NCSA must fail for two reasons. First, he asserts that the NCSA only apples to those people who sell or offer to sell securities, and that the offer to sell or buy the security must be made in North Carolina. As such, plaintiff cannot state a prima facie case. Second, he claims that the cause of action is barred by the applicable statute of limitations. *See* N.C. Gen.Stat. § 77A–56(f). Panju abandons the second argument in his reply brief in light of plaintiffs' rejoinder that the two-year statute of limitations is subject to equitable tolling principles and runs not from the signing of the Carson SPA, but from the time when the fraud reasonably should have been discovered. *Andrews v. Fitzgerald*, 823 F.Supp. 356, 365–66 (M.D.N.C.1993). Thus, the statute began to run only when the fraud was first revealed in 1999. Panju's first argument fails as well. Assuming Panju is correct that the offer to buy or sell securities must be made in North Carolina, plaintiffs have, indeed, alleged that Panju traveled to North Carolina in order to make an offer to buy Carson–Dellosa securities in exchange for CINAR stock. Carson Am. Compl. ¶ 20.

Panju attempts to resuscitate his point by adopting an extremely strained reading of the statute. The statute defines "offer" to include "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value." N.C. Gen.Stat. § 78A–2(8)(b). Panju contends that his actions, as alleged by the Carson Plaintiffs, could only be considered an "offer to buy" and not a *"solicitation* of an offer to buy" and are therefore not covered by the statute. To rule that his alleged behavior is covered by the statute, in Panju's estimation, would be to render the statute's inclusion of the word "solicita-

tion" meaningless. The Court takes this point to mean that if Panju asked the Carson Plaintiffs to make him an offer to buy CINAR stock, that is covered, but if Panju made plaintiffs an offer to buy Carson–Dellosa stock, then that is not covered. This is a meaningless distinction, especially in this case where each side swapped their stocks for those of the other. Accordingly, this argument does not provide a basis for a motion to dismiss.

### 7. "Aiding and Abetting" Liability

■■■ Carson Plaintiffs assert that Panju is liable for aiding and abetting fraud because he was "aware of the fraud committed by CINAR in inducing Plaintiffs to enter the [Carson SPA]." Carson Am. Compl. ¶ 125. Panju asserts that according to the Supreme Court's holding in *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), which barred "aiding and abetting" claims under 10(b), plaintiffs cannot bring this cause of action. *See id.* at 190–91, 114 S.Ct. 1439. Plaintiffs do not dispute that the Supreme Court eliminated "aiding and abetting" claims under federal securities laws, but maintain that they may still bring the action under North Carolina law; such claims were not abrogated by *Central Bank*. Plaintiffs are correct that *Central Bank*, by itself, does not eliminate state law causes of action for aiding and abetting fraud. Nevertheless, in *Teague v. Bakker*, 35 F.3d 978 (4th Cir.1994), the Fourth Circuit considered how the North

Carolina Supreme Court would assess the impact of *Central Bank* on aiding and abetting liability under Section 78A–8. The Fourth Circuit found that the North Carolina Supreme Court would conclude that Section 78A–8 could not support an aiding and abetting claim. *See id.* at 991–92. In response, the Carson Plaintiffs cite only one case where one of the plaintiff's stated causes of action is an aiding and abetting claim under North Carolina law. *See Pleasant Valley Promenade v. Lechmere, Inc.*, 120 N.C.App. 650, 464 S.E.2d 47 (1995). *Pleasant Valley*, however, contains no discussion of this point whatsoever. *See id.* In the absence of a compelling argument to the contrary, this Court adopts the Fourth Circuit's interpretation of North Carolina law and grants Panju's motion to dismiss.[35]

### 8. Personal Jurisdiction

■■■ Panju challenges this Court's jurisdiction under both the Exchange Act and North Carolina law. As previously explained, Section 27 of the Exchange Act establishes the basis for personal jurisdiction in securities cases, and its reach extends to the limit of the Due Process Clause.[36] Carson Plaintiffs argue that Panju's contacts with North Carolina are more than enough to confer jurisdiction. Panju made phone calls to plaintiffs in North Carolina and traveled to North Carolina to convince plaintiffs to enter into the Carson SPA. Carson Am. Compl. ¶ 20. Thus, even though considerable activity

---

**35.** It is unclear whether the Carson Plaintiffs are alleging that Panju aided and abetted CINAR's alleged state securities law fraud (Count Three) or its alleged common law fraud (Count Four) or both. *See* Carson Am. Compl. ¶¶ 124–129. Because Section 78A–8 is the only state securities law that the Carson Plaintiffs allege was violated, *see id.* ¶¶ 87–99, *Teague* is dispositive of that claim. As for aiding and abetting a violation of common law fraud, assuming the Carson Plaintiffs

have asserted this cause of action, there appears to be no legal foundation in North Carolina law to support such a claim. *See Venturtech II v. Deloitte Haskins & Sells*, 790 F.Supp. 576, 587 (E.D.N.C.1992) (noting that no North Carolina case appeared to exist that recognized a cause of action for aiding and abetting a fraud).

**36.** *See* discussion *supra* Section D.1.

took place outside of North Carolina, it was all directed toward that forum such that Panju could easily foresee "being haled into court there." *World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. 559. Moreover, because North Carolina's long-arm statute also extends to the limits of the Due Process Clause, *see Dillon v. Numismatic Funding Corp.,* 291 N.C. 674, 676, 231 S.E.2d 629, 630 (1977), jurisdiction over Panju is proper for the state claims as well. Panju does not dispute the contacts mentioned by the plaintiffs, but asserts that he is protected by the "fiduciary shield" doctrine which states that jurisdiction over an individual defendant must be based on that defendant's *individual* contacts with the forum state and not on the defendant's contacts made in his official capacity on behalf of the defendant corporation. Panju contends that because all contacts alleged by the Carson Plaintiffs are contacts Panju made on behalf of CI-NAR, jurisdiction does not lie.

In *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984), and *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), both issued on the same day, the Supreme Court clarified the rules for asserting jurisdiction over employees acting in their official capacity. In *Keeton,* the Court stated, "[W]e today reject the suggestion that employees who act in their official capacity are somehow shielded from suit in their individual capacity. But jurisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him … Each defendant's contacts with the forum State must be assessed individually." *Keeton,* 465 U.S. at 781 n. 13, 104 S.Ct. 1473; *accord Calder,* 465 U.S. at 790, 104 S.Ct. 1482 ("[Employees'] contacts … are not to be judged according to their employer's activities [in the forum state] … [but] their status as employees does not somehow insulate them from jurisdiction."). While

these cases recognize that it would be improper to impute the corporation's contacts to an individual defendant, they reject outright the notion of a "fiduciary shield" that would preclude the exercise of jurisdiction as a matter of due process. *See Davis v. Metro Productions, Inc.,* 885 F.2d 515, 521 (9th Cir.1989) (stating that *Calder* and *Keeton* refused to recognize that the fiduciary shield doctrine created "a due process limit on jurisdiction"). This result comports with earlier, pre-*Calder/Keeton* circuit court opinions holding that the "fiduciary shield" doctrine is not a constitutional doctrine, but rather something to be considered in analyzing a state's long-arm statute. *See Columbia Briargate Co. v. First Nat'l Bank in Dallas,* 713 F.2d 1052, 1060 (4th Cir.1983); *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 903 n. 3 (2d Cir.1981).

Despite this guidance from the Supreme Court, it appears that the "fiduciary shield" doctrine is still causing some confusion. Panju correctly points out that at least one federal district court has applied the fiduciary shield doctrine to deny jurisdiction under Section 27 of the Exchange Act. *See Medoil Corp. v. Clark,* 753 F.Supp. 592, 599–600 (W.D.N.C.1990). It is unclear whether *Medoil* holds that the "fiduciary shield" doctrine places a due process limit on the exercise of personal jurisdiction, as the court devotes little attention to that issue. *See id.* To the extent that *Medoil* may so hold, this Court disagrees, finding that such a ruling contravenes prevailing case law. The Court is inclined to read *Medoil* as consonant with *Calder* and *Keeton* which specified that jurisdiction must be based on individual contacts, not contacts imputed from the corporation. *See Calder,* 465 U.S. at 790, 104 S.Ct. 1482; *Keeton,* 465 U.S. at 781 n. 13, 104 S.Ct. 1473. Thus, the *Medoil* court was simply reacting to the fact that the defendant had few contacts with the forum

state and, as a result, was unwilling to impute corporate contacts for the purposes of establishing jurisdiction. *See Medoil,* 753 F.Supp. at 596–97. In this respect, *Medoil* is no different than the others cases cited by Panju, all of which involve defendants who had limited contact with the forum state. *See Mates v. North Am. Vaccine, Inc.,* 53 F.Supp.2d 814 (D.Md. 1999); *May Apparel Group, Inc. v. Ava Import–Export, Inc.,* 902 F.Supp. 93 (M.D.N.C.1995). Panju clearly had more substantial contacts with North Carolina than did the defendants in these cases with their respective fora. He traveled there personally to negotiate the SPA that is the subject of the Carson suit. Thus, having concluded that the fiduciary shield doctrine does not place a due process limit on jurisdiction, plaintiffs have alleged sufficient facts to establish minimum contacts with North Carolina. Jurisdiction over Panju is proper under Section 27 of the Exchange Act and under the North Carolina long-arm statute. *See Leasco,* 468 F.2d at 1339–40; *Dillon,* 291 N.C. at 676, 231 S.E.2d 629.

## CONCLUSION

For the reasons stated above, the motions to dismiss the Carson Plaintiffs' claim under NCUTPA brought by defendants CINAR and Panju are granted. Panju's motion to dismiss the Carson Plaintiffs' claim for aiding and abetting fraud is also granted. All other motions are denied.

SO ORDERED.